IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,051

HODES & NAUSER, MDS, P.A., and TRACI LYNN NAUSER, M.D.,
*Appellees*,

v.

JANET STANEK, in Her Official Capacity as Secretary of the Kansas
Department of Health and Environment; STEPHEN M. HOWE, in His Official
Capacity as District Attorney for Johnson County, Kansas; and KRIS
KOBACH, in His Official Capacity as Attorney General for the State of
Kansas,
*Appellants*.

SYLLABUS BY THE COURT

1.

Kansas courts use a two-part standing test. First, the party who claims standing must show a cognizable injury. Second, the party must establish a causal connection between the cognizable injury and the challenged conduct. A cognizable injury, or an injury in fact, occurs when the party personally suffers an actual or threatened injury because of the challenged conduct.

2.

A challenge to a statute's constitutionality presents a question of law subject to unlimited review.

3.

The Kansas Supreme Court is the final authority on whether a Kansas statute violates the Kansas Constitution.

4.

Section 1 of the Kansas Constitution Bill of Rights protects an inalienable natural right of personal autonomy, which includes the right to abortion. The unique and profound attributes of the decision to have an abortion are integral to a woman's inalienable natural right of personal autonomy under section 1; thus, laws that infringe on the right to abortion are subject to strict scrutiny.

5.

Under strict scrutiny, the initial burden is on the plaintiff to prove a challenged law actually infringes on a constitutionally protected right under section 1 of the Kansas Constitution Bill of Rights. Any degree of actual infringement on such a right—however slight—triggers strict scrutiny.

6.

Once a plaintiff proves actual infringement of a protected right under section 1, the court presumes the law is unconstitutional and the burden shifts to the State to defend the challenged law under strict scrutiny. Strict scrutiny requires the State to prove (a) the existence of a compelling government interest, (b) its actions further that compelling interest, and (c) its actions do so in a way that is narrowly tailored.

7.

A compelling interest is extremely weighty, possibly urgent, and rare—much rarer than merely legitimate interests and rarer too than important interests.

8.

Once the State establishes an interest as compelling, the State must show any regulations it claims further that interest do *so in fact*, not merely in theory, and the regulations are a substantially effective means for advancing the State's identified compelling interest. A court's determination about whether the State met this burden must be based on evidence presented in judicial proceedings. Mere deference to legislative or administrative findings or stated goals is insufficient.

9.

A severability clause is merely an aid, and courts must still divine the intent of the Legislature from the statute's text. Legislative intent is the touchstone of statutory interpretation.

10.

For parts of a legislative enactment to survive a severability analysis, the State must prove (a) the Legislature would have passed the enactment at issue without the objectionable portion and (b) the enactment can still operate effectively to carry out the Legislature's intent without the stricken portion. The severability test is inapplicable when the entire statutory scheme is objectionable.

Appeal from Shawnee District Court; MARY E. CHRISTOPHER, judge. Oral argument held March 27, 2023. Opinion filed July 5, 2024. Affirmed.

*Anthony J. Powell*, solicitor general, argued the cause, and *Brant M. Laue*, former solicitor general, *Jeffrey A. Chanay*, former chief deputy attorney general, *Dwight R. Carswell,* deputy solicitor general, *Shannon Grammel*, former deputy solicitor general, *Kurtis K. Wiard*, assistant solicitor general, and *Derek Schmidt*, former attorney general, were with him on the briefs for appellants.

*Caroline Sacerdote*, pro hac vice, of Center for Reproductive Rights, of New York, New York, argued the cause, and *Hillary Schneller*, pro hac vice, of the same organization, and *Teresa A. Woody*, of The Woody Law Firm P.C., of Kansas City, Missouri, were with her on the brief for appellees.

The opinion of the court was delivered by

STANDRIDGE, J.: At issue are a series of statutes and implementing regulations ("Challenged Laws") relating to licensure of abortion provider facilities. An abortion care facility and its doctors ("Providers") challenged the constitutionality of the Challenged Laws and requested the Shawnee County District Court enjoin the State from enforcing them. The district court issued a temporary order enjoining enforcement of the Challenged Laws pending a final judgment.

After discovery, the parties filed cross-motions for summary judgment. The district court granted the Providers a declaratory judgment and issued a permanent injunction restraining the State from enforcing the Challenged Laws. The district court held (1) the Challenged Laws infringe on a woman's fundamental right to personal autonomy guaranteed under section 1 of the Kansas Constitution Bill of Rights and are thus subject to strict scrutiny, (2) the Challenged Laws do not survive strict scrutiny because they do not further the State's identified compelling interest and are not narrowly tailored to that end, (3) no part of the Challenged Laws can operate independently under the statute's severability clause, and (4) the Challenged Laws violate the equal protection provisions of the Kansas Constitution.

The State appeals and we affirm. As explained, the State failed to meet its evidentiary burden to show the Challenged Laws further its identified compelling interest in protecting maternal health and regulating the medical profession as it relates to

4

maternal health. Without this showing, the Challenged Laws do not survive strict scrutiny and are constitutionally infirm. We decline the State's request to sever the unconstitutional licensure requirements because the State failed to meet its burden to show severability is proper under applicable Kansas law. Finally, we deem it unnecessary to address the district court's finding of an equal protection violation because we are affirming the district court's decision on grounds that the State failed to satisfy its burden to show the Challenged Laws further a compelling state interest.

FACTUAL AND PROCEDURAL BACKGROUND

Hodes & Nauser, MDs, P.A., operates the Center for Women's Health (CWH), a medical practice providing obstetrical and gynecological care, including abortion care. Dr. Traci Nauser is a board-certified obstetrician-gynecologist licensed to practice medicine in Kansas. She provides abortion care up to 21.6 weeks LMP (21 weeks and 6 days since the patient's last menstrual period). Along with her practice at CWH, Dr. Nauser provides hospital-based care to patients who need services in that setting including antepartum care; vaginal and cesarean deliveries; postpartum care; obstetrical and gynecological surgeries; and labor inductions. Dr. Nauser's father, Dr. Herbert Hodes, founded CWH in 1978 and practiced there until his 2017 retirement. CWH has provided abortion care in the same physical facility for more than 30 years.

The Kansas Board of Healing Arts has long regulated licensed clinicians like Dr. Hodes and Dr. Nauser and the care they provide at medical offices like CWH. The Board's regulations define medical "office" as "any place intended for the practice of the healing arts in the State of Kansas." K.A.R. 100-25-1(f). Board regulations specifically exclude hospitals, ambulatory surgical centers (ASCs), or recuperation centers from its

5

definition of medical office because those facilities already are licensed and regulated by the Kansas Department of Health and Environment (KDHE). K.A.R. 100-25-1(f).

Relevant to CWH, Board regulations include standards for maintaining cleanliness; infection control and the disposal of biological waste; maintaining drugs, supplies, and medical equipment; maintaining the safety of the physical facility; reporting hospital transfers; investigating and disciplining clinicians; and administering sedation or anesthesia, including local and general anesthesia, as well as spinal and epidural blocks. K.A.R. 100-25-1 et seq. The district court found CWH complied with these applicable standards of care for providers of office-based surgery. It also found CWH followed the clinical standards set out by the American College of Obstetricians and Gynecologists, the leading medical professional organization for OB/GYNs in the United States, and the National Abortion Federation, the leading medical professional association for clinicians providing abortion care in North America.

Despite preexisting Board regulations governing licensed clinicians working in a clinic providing office-based surgery, the Legislature in 2011 passed S.B. 36, which created a new KDHE licensing requirement targeting medical facilities that provide abortion care. See K.S.A. 65-4a01 et seq. S.B. 36 defines facility as "any clinic, hospital or ambulatory surgical center, in which any second or third trimester elective abortion, or five or more first trimester elective abortions are performed in a month, excluding any abortion performed due to a medical emergency." K.S.A. 65-4a01(g). Given hospitals and ambulatory surgical centers are already required to be licensed by KDHE, the practical effect of the new law is limited to creating a KDHE licensing regimen for clinics providing abortion care.

As required by S.B. 36, KDHE adopted temporary regulations to carry out its purpose. See K.S.A. 65-4a09. The 30-page temporary regulations included extensive requirements for all aspects of medical abortion facilities including staffing, procedures, equipment, and physical environment. Two days before the effective date, the Providers sued in federal court challenging the constitutionality of S.B. 36 and the temporary regulations. The federal court entered a preliminary injunction preventing the State from enforcing them. See *Hodes & Nauser v. Moser*, No. 2:11-cv-02365-CM-KMH (D. Kan. July 1, 2011) (order granting preliminary injunction). After the temporary regulations expired in October 2011, the Providers dismissed the federal suit. *Hodes & Nauser*, No. 2:11-cv-02365-CM-KMH (D. Kan. July 19, 2012) (order dismissing case with prejudice).

KDHE then adopted permanent regulations, which were set to take effect in November 2011. See K.A.R. 28-34-126 to K.A.R. 28-34-144. But before the permanent regulations could take effect, the Providers filed this case in state court challenging the constitutionality of S.B. 36 and its permanent regulations. The Providers requested a temporary injunction to enjoin the State from enforcing them pending final judgment. The district court granted that request. The parties later agreed the State would not enforce S.B. 36 or the permanent regulations pending final judgment.

In 2015, the Legislature repealed one provision of the statutory scheme—K.S.A. 2014 Supp. 65-4a10—and enacted an amended version. See L. 2015, ch. 84, § 1. Relevant here, the original version of K.S.A. 65-4a10, in effect from 2011 through June 10, 2015, required the prescribing physician be physically present in the same room as the patient when a drug is administered to induce an abortion. The 2015 amended statute is substantially the same as the original version but added exceptions to the in-person medication requirement for in-hospital, induced-labor abortions and for medical emergencies.

7

Four years later, the State moved to clarify or dissolve the temporary injunction. First, the State sought clarification on whether the 2011 Agreed Order not to enforce S.B. 36 pending final judgment applied to K.S.A. 2015 Supp. 65-4a10. In the alternative, the State sought to dissolve the injunction as it applied to K.S.A. 2015 Supp. 65-4a10, arguing the Providers lacked standing to challenge that particular statutory provision because they acknowledged in discovery they were complying with its requirements. The district court denied the requested relief. The State appealed, claiming jurisdiction under K.S.A. 2020 Supp. 60-2102(a)(2), which authorizes immediate appeals from any order granting, refusing, modifying, dissolving, or continuing an injunction. The Court of Appeals held it lacked jurisdiction because the district court's order did not grant, refuse, modify, dissolve, or continue the injunction. As a result, the Court of Appeals dismissed the appeal as prematurely filed. *Hodes & Nauser, MDs v. Norman*, No. 121,046, 2021 WL 520661, at *11-12 (Kan. App. 2021) (unpublished opinion).

In 2019, this court decided *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 440 P.3d 461 (2019) (*Hodes I*). There, we held section 1 of the Kansas Constitution Bill of Rights protects an inalienable natural right to personal autonomy, which includes the right to abortion. 309 Kan. at 614. And we held laws that infringe on the right to abortion are subject to strict scrutiny. 309 Kan. at 665.

After the parties completed discovery in March 2021, they filed competing motions for summary judgment. Following oral argument on the motions, the district court denied the State's motion for summary judgment and granted summary judgment for the Providers. In its ruling, the district court found:

8

- Abortion is one of the safest types of medical care provided in the United States. Both abortion-related mortality (death) and abortion-related morbidity (non-fatal complications) are very rare.

- Abortion is approximately 14 times safer than carrying a pregnancy to term. The Centers for Disease Control and Prevention reported in 2015 that the legal abortion-related mortality rate was 0.7 deaths per 100,000 procedures. Mortality from childbirth is 8.8 deaths per 100,000 live births.

- Abortion-related mortality is also significantly lower than that for other common outpatient medical procedures, such as colonoscopy (5 deaths per 100,000 procedures) and some plastic surgeries (1.7 deaths per 100,000 procedures).

- Serious non-fatal complications of abortion as currently performed at outpatient facilities are extremely rare. In a recent study examining about 55,000 abortions, the incidence of major complications was 0.23%.

- Nearly one in four women in the United States will obtain an abortion in their lifetimes.

The district court struck down all the Challenged Laws, finding (1) they infringed on a woman's fundamental right to personal autonomy guaranteed under section 1 of the Kansas Constitution Bill of Rights, (2) the Challenged Laws do not survive strict scrutiny because they do not further the State's identified compelling interest and are not narrowly tailored to that end, (3) none of the Challenged Laws can operate independently under the

9

statute's severability clause, and (4) the Challenged Laws violate the equal protection provisions of the Kansas Constitution. The court declared the Challenged Laws unconstitutional and issued a permanent injunction restraining the State from enforcing them.

The State moved to alter or amend the district court's decision, arguing the Providers lacked standing to challenge K.S.A. 65-4a10 (the medication-in-person requirement) because the Providers acknowledged in discovery they were complying with it. The district court denied the motion, finding an injury existed because Dr. Nauser was complying with the statute only to avoid potential criminal prosecution and action against her license.

The State appealed to this court under K.S.A. 60-2101(b) (directing appeal to Kansas Supreme Court when state statute held unconstitutional).

STANDING

The State's notice of appeal includes the district court's order denying its motion to alter or amend the court's judgment. In that motion, the State argued the Providers lacked standing to challenge K.S.A. 65-4a10, as amended—the statute dictating that a physician prescribing RU-486 (mifepristone) or any other abortion-inducing drug must be in the same room as the patient when administered. The State's rationale to the district court for challenging the Providers' standing was that the Providers were complying with the medication-in-person doctor requirement.

Although the State's notice of appeal asserts it is appealing from the district court's standing decision on the medication-in-person requirement, the State's appellate brief

10

mentions it only in the context of factual background and fails to raise or brief standing as a substantive issue. By failing to raise or brief the standing issue, the State appears to have abandoned any challenge to the district court's decision on standing. See *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018) ("Where the appellant fails to brief an issue, that issue is waived or abandoned."). That said, standing is a component of subject matter jurisdiction and this court has an obligation to ensure we have jurisdiction. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 916, 296 P.3d 1106 (2013) (appellate court has a duty to question jurisdiction on its own initiative and exercises unlimited review over jurisdictional issues). Thus, we will address it.

Kansas courts use a two-part standing test. *Kansas Bldg. Industry Workers Comp. Fund v. State*, 302 Kan. 656, 680, 359 P.3d 33 (2015). To show standing, a party "'must show a cognizable injury and establish a causal connection between the injury and the challenged conduct.'" *State v. Stoll*, 312 Kan. 726, 734, 480 P.3d 158 (2021). A cognizable injury, or an injury in fact, occurs when the party personally suffers an actual or threatened injury because of the challenged conduct. *KNEA v. State*, 305 Kan. 739, 747, 387 P.3d 795 (2017). For a matter to be justiciable, the parties must have "adverse legal interests that are immediate, real, and amenable to conclusive relief." *Kansas Bldg. Industry Workers Comp. Fund*, 302 Kan. at 678.

Under the Kansas standing test, the Providers must show they suffered an actual or threatened injury stemming from the statutory medication-in-person requirement. In its response to the State's motion to alter or amend judgment, the Providers claim they suffer a threatened injury because, under this statute, they will face penalties—including, but not limited to, revocation of their license to practice medicine and revocation of the license to operate their facility—if a physician does not comply with the medication-in-

11

person requirement. See K.S.A. 65-4a10(d) ("A violation of this section shall constitute unprofessional conduct under K.S.A. 65-2837."); K.S.A. 65-2836(b) (A licensee's medical license may be revoked, suspended, or limited upon a finding that the licensee has committed an act of unprofessional conduct.); K.S.A. 65-4a02(a) ("A facility shall be licensed in accordance with K.S.A. 65-4a01 through 65-4a12."); K.S.A. 65-4a08(a), (c) (Operating an abortion facility without a license is a class A nonperson misdemeanor, with no requirement of culpable mental state, and constitutes unprofessional conduct under K.S.A. 65-2837.). Thus, this is a pre-enforcement challenge.

The State does not dispute that the statutory penalties for violating the medication-in-person requirement include medical license revocation and inability to obtain and maintain an abortion facility license. Instead, the State argued the Providers fail to show a cognizable injury resulting from the medication-in-person requirement because they are choosing to comply with it. But the State's argument is based on misapplication of the standing test, which recognizes an injury in fact for purposes of standing when a party personally suffers not just an actual injury, but also a threatened injury because of the challenged conduct. *League of Women Voters of Kansas v. Schwab*, 317 Kan. 805, 813, 539 P.3d 1022 (2023) (recognizing Kansas' traditional standing rule for pre-enforcement challenges). Simply put, a plaintiff need not break a law to challenge it. See *Doe v. Bolton*, 410 U.S. 179, 188, 93 S. Ct. 739, 35 L. Ed. 2d 201 (1973) (expressing federal pre-enforcement standing rule which Kansas has adopted) ("The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory . . . conditions" and therefore "assert[s] a sufficiently direct threat of personal detriment."); see also *303 Creative LLC v. Elenis*, 600 U.S. 570, 589, 143 S. Ct. 2298, 216 L. Ed. 2d 1131 (2023) (noting the plaintiff had to "either speak as the State demands or face sanctions for expressing her own beliefs").

In its order denying the State's motion to alter or amend judgment, the district court found an injury existed because Dr. Nauser was complying with the statute only to avoid potential criminal prosecution and action against her license. The district court relied on Dr. Nauser's testimony stating she complies with the medication-in-person requirement only because of "the uncertainty caused by the State regarding whether this [medication-in-person] requirement was in effect or not." "Otherwise," she testified, "I would plan to have a nurse or another qualified person administer mifepristone while I could attend to other needs in the office, just as I do with other medications." On appeal, the State does not dispute Dr. Nauser's testimony or the district court's findings in this regard.

We agree with the district court's analysis and find the Providers have met their burden to show they have standing to challenge K.S.A. 65-4a10, as amended.

ANALYSIS

The State challenges the district court's decision to grant summary judgment for the Providers and to strike down the Challenged Laws as unconstitutional. The State argues (1) the district court erred in finding the Challenged Laws infringe on the right to abortion; (2) even if they infringe on the right to abortion, the district court erred in finding the Challenged Laws do not survive strict scrutiny; (3) the district court erred by ignoring the statute's severability clause and striking down the Challenged Laws in their entirety; and (4) the district court erred in finding the Challenged Laws violate the equal protection provisions of the Kansas Constitution.

13

*Standard of review*

A challenge to a statute's constitutionality presents a question of law subject to unlimited review. *State v. Robison*, 314 Kan. 245, 248, 496 P.3d 892 (2021). The Kansas Supreme Court is the final authority on whether a Kansas statute violates the Kansas Constitution. See *Harris v. Shanahan*, 192 Kan. 183, 206-07, 387 P.2d 771 (1963) ("In the final analysis, this court is the sole arbiter of the question whether an act of the legislature is invalid under the Constitution of Kansas.").

An appellate court reviews a summary judgment decision de novo, applying the same legal standard as the district court. *Schreiner v. Hodge*, 315 Kan. 25, 30, 504 P.3d 410 (2022). Summary judgment is appropriate only when the pleadings, depositions, affidavits, and other supporting materials filed with the court show no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. 315 Kan. at 30.

A. *Strict scrutiny constitutional framework*

In *Hodes I*, this court held section 1 of the Kansas Constitution Bill of Rights protects an inalienable natural right to personal autonomy, which includes the right to decide whether to continue (or terminate) a pregnancy. 309 Kan. at 650. We also held laws that infringe on the right to abortion are subject to strict scrutiny. 309 Kan. at 665, 671. Under strict scrutiny, the initial burden is on the plaintiff to prove a challenged law actually infringes on a constitutionally protected fundamental right under section 1. Any degree of actual infringement—however slight—triggers strict scrutiny. Once a plaintiff proves a statute infringes on a constitutionally protected fundamental right under section 1, the court presumes the law is unconstitutional and the burden shifts to the State to

14

defend the law under strict scrutiny. Strict scrutiny requires the State to prove (a) the existence of a compelling government interest, (b) its actions further that compelling interest, and (c) its actions do so in a way that is narrowly tailored. 309 Kan. at 669.

Today, in *Hodes & Nauser, MDs v. Kobach* (*Hodes II*), 318 Kan. ___ (No. 124,130, this day decided), we reaffirmed the strict scrutiny constitutional framework used in *Hodes I* set forth above. Thus, we apply it here to determine the constitutionality of the Challenged Laws.

1. *The asserted right at stake*

The district court found the asserted right implicated by the Challenged Laws—that target only facilities that provide abortion care—is the right to abortion, which is protected under section 1 of the Kansas Constitution Bill of Rights. As this court held in *Hodes I*, the ability to decide whether to continue or terminate a pregnancy (have an abortion) is integral to a woman's exercise of her inalienable natural right of personal autonomy under section 1. 309 Kan. at 631, 635, 646 ("Denying a pregnant woman the ability to determine whether to continue a pregnancy would severely limit her right of personal autonomy."). As an inalienable natural right of personal autonomy with profound and unique attributes, the right to decide to have an abortion is a fundamental right subject to strict scrutiny. See *Hodes I*, 309 Kan. at 636, 645, 647, 650, 663, 681, 685 (Strict scrutiny "applies when a fundamental right is implicated."). Thus, we agree with the district court that the asserted right is protected under section 1 and strict scrutiny applies.

Given the various issues raised in the separate opinions of Justices Stegall and Wilson regarding the relationship between natural and fundamental rights in terms of

15

applying strict scrutiny, we find it helpful to review the analysis in *Hodes I* on that issue before moving on to discuss infringement. Relevant here, the court began its opinion with a broad summary of its holdings:

> "Included in that limited category [of inalienable natural rights in section 1 of the Kansas Constitution Bill of Rights] is the right of personal autonomy, which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows a woman to make her own decisions regarding her body, health, family formation, and family life—decisions that can include whether to continue a pregnancy. Although not absolute, this right is fundamental. Accordingly, the State is prohibited from restricting this right unless it is doing so to further a compelling government interest and in a way that is narrowly tailored to that interest. And we thus join many other states' supreme courts that recognize a similar right under their particular constitutions." 309 Kan. at 614.

In the body of the opinion, the court provided legal analysis to support its holding that personal autonomy is protected under section 1 as an inalienable natural right and the decision to continue or terminate a pregnancy is included within that right. Emphasizing that section 1 of the Kansas Constitution Bill of Rights differs from any federal counterpart, the court did not use the United States Supreme Court standard for deciding whether the asserted right is protected as fundamental under section 1. See 309 Kan. at 623-27. See also *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) (Before a right can be deemed fundamental under the Due Process Clause of the Fourteenth Amendment, it must be "deeply rooted in this Nation's history and tradition, and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'"). Instead, the court articulated its own standard for deciding whether the asserted right is entitled to protection under section 1 of the Kansas Constitution Bill of Rights.

"As discussed, we reach our conclusion that section 1 of the Kansas Constitution Bill of Rights protects a woman's right to make decisions about whether she will continue a pregnancy based on several factors. These include an analysis of natural rights, Lockean principles, the caselaw of Kansas, the rationale and holdings of court decisions from other jurisdictions reviewing broad constitutional natural rights provisions or other provisions similar to ours, and the history of early statutes limiting abortion in Kansas. These factors lead us to conclude that section 1's declaration of natural rights, which specifically includes the rights to liberty and the pursuit of happiness, protects the core right of personal autonomy—which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows Kansans to make their own decisions regarding their bodies, their health, their family formation, and their family life. Pregnant women, like men, possess these rights." 309 Kan. at 660.

Only after engaging in this analysis did the court conclude that the decision to continue or terminate a pregnancy is protected under section 1 as an inalienable natural right of personal autonomy. After completing this analysis, the court equated its holding that personal autonomy is a natural inalienable right to one that personal autonomy is a fundamental right. See 309 Kan. at 674 (calling personal autonomy "fundamental" after concluding it is protected under section 1 as a natural inalienable right). The court then set forth in detail its reasons for adopting strict scrutiny as the standard for assessing infringement on the right.

Thus, regarding the relationship between natural and fundamental rights, *Hodes I* dictates that the right to abortion is subject to strict scrutiny because it is an exercise of the inalienable natural right of personal autonomy protected by section 1 of the Kansas Constitution Bill of Rights, which is a fundamental right.

## 2. *Infringement*

The district court found the Providers met their burden to prove the Challenged Laws infringe on a woman's fundamental right to abortion. The court cited uncontroverted evidence to support this finding. Missing from the district court's discussion, however, is the standard of proof it used in finding the Providers met their burden to prove infringement. In *Hodes I*, we held any evidence of infringement on a fundamental right protected under section 1 satisfies a plaintiff's burden to prove infringement under the strict scrutiny framework. 309 Kan. at 669 ("[O]nce a plaintiff proves an infringement—regardless of degree—the government's action is presumed unconstitutional."). Although any degree of infringement is sufficient, we held a plaintiff must show the government action *actually* impairs a fundamental right protected under section 1 to meet the burden of proof for infringement. An unsupported claim that government action *appears* to impair the section 1 right is not enough to satisfy this burden. See 309 Kan. at 672 ("[B]efore a court considers whether a governmental action survives this [strict scrutiny] test, it must be sure the action actually impairs the right. In some cases, it will be obvious that an action has such effect. Imprisonment, for example, obviously impairs the right to liberty. In other cases, the court may need to assess preliminarily whether the action only appears to contravene a protected right without creating any actual impairment.").

In distinguishing between an actual impairment and an appearance of impairment, we cited *Planned Parenthood of Southeastern Pa. v. Casey*, where the United States Supreme Court stated that "not every law which makes a right more difficult to exercise is, *ipso facto*, an infringement of that right." *Hodes I*, 309 Kan. at 672 (citing *Casey*, 505 U.S. 833, 873, 112 S. Ct. 2791, 120 L. Ed. 2d 674 [1992], *overruled in part by Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 142 S. Ct. 2228, 213 L. Ed. 2d

18

545 [2022]). We cited to this statement in *Casey* to support our distinction between an actual impairment and an appearance of impairment. But we did not adopt it as a standard to prove impairment. When read in context, the statement in *Casey* is analytically intertwined with its decision to change the standard of review in abortion cases from the traditional tiered-scrutiny analysis to the "undue burden" test. Under that test, an abortion law or regulation is unconstitutional if "its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion." 505 U.S. at 878. The undue burden test focuses on the legitimacy of the regulation and the extent to which it interferes with the right to access abortion care.

In *Hodes I*, however, we specifically rejected the undue burden test in favor of the traditional tiered-scrutiny analysis. Unlike the undue burden test, strict scrutiny analysis focuses on the *nature* of the right at stake, not the *extent* to which the right is infringed:

> "In essence, the undue burden test emphasizes the governmental interest by simply balancing it against the individual rights of Kansans. This is instead of starting with an emphasis on the individual's rights and requiring the government to establish its compelling interest and to prove its action is narrowly tailored to serve that interest— even if the infringement is slight. And by placing their acknowledgment of these individual rights in the first section of Kansans' Bill of Rights, the drafters and adopters of our Constitution made clear the rights are foremost." *Hodes I*, 309 Kan. at 670.

Given its focus on the nature of the right at stake, the standard of proof for infringement under strict scrutiny set forth in *Hodes I* is clear: once a plaintiff proves an actual infringement—*regardless of degree* and *even if the infringement is slight*—the government's action is presumed unconstitutional, and the burden shifts to the government to establish the requisite compelling interest and narrow tailoring of the law to serve it. 309 Kan. at 669-70. See also *Whole Woman's Health v. Hellerstedt*, 579 U.S.

19

582, 643, 136 S. Ct. 2292, 195 L. Ed. 2d 665 (2016) (Thomas, J., dissenting) ("A law either infringes a constitutional right, or not; there is no room for the judiciary to invent tolerable degrees of encroachment."), *abrogated by Dobbs,* 597 U.S. 215. We reaffirm the *Hodes I* infringement standard here.

We now apply that standard to determine whether the Providers met their burden to show the Challenged Laws actually infringe on a woman's fundamental right to an abortion—regardless of degree and however slight. The State presents two arguments to support its claim the Providers failed to meet their burden. First, the State argues there is no infringement because the Challenged Laws do not impose an unqualified ban on abortion care to patients; instead, the State asserts they merely require the Providers to comply with the Challenged Laws. Second, the State argues there is no infringement because, even if the Providers cannot comply with the Challenged Laws, the patients can seek abortion care elsewhere in the state.

We disagree. Both arguments incorrectly assume government infringement on a woman's right to abortion can be established *only* by an unqualified ban on all abortion. But as we just discussed, any degree of infringement—however slight—on a fundamental right protected under section 1 triggers strict scrutiny. And as the district court found, the Providers proved the Challenged Laws infringe on a woman's right to abortion. The court explained:

> "For example, Dr. Nauser stated the Challenged Laws 'will make it more difficult, if not impossible, for CWH to continue offering abortion care.' Dr. Nauser indicated the Challenged Laws will force CWH to see fewer patients, cause CWH patients to face higher costs, or result in unjustifiably delayed and obstructed services. Dr. Nauser identified other burdens imposed by the Challenged Laws, summarized next:

20

- Staffing and monitoring restrictions imposed by K.A.R. 28-34-135(m); K.A.R. 28-34-138(c); K.A.R. 28-34-138(f); K.A.R. 28-34-139(a)(2); and K.A.R. 28-34-137(c) increase the costs of services and delay a patient's ability to receive services.

- Recovery-related restrictions imposed by K.A.R. 28-34-139(a) burden patients by requiring them to stay at least twice as long as is medically necessary and delays a patient's ability to receive services because less patients can be scheduled in one day. Similarly, the requirements of K.A.R. 28-34-133(b)(7) of a 'nurse station with visual observation of each patient in the recovery area' impose staffing and building structure burdens that would also cause delays or prohibit the services offered altogether.

- Board of Pharmacy registration restrictions imposed by K.A.R. 28-34-135(n) would impose financial burdens on CWH.

- Requirements for the administration of mifepristone imposed by K.S.A. 65-4a10(b)(1) restrict a physician's ability to tend to other patients by prohibiting other qualified staff from administering the medication.

- Medical waste regulations imposed by K.A.R. 28-34-127(c) threaten CWH's ability to maintain its current medical waste contract, which would result in the closure of CWH.

- Equipment and facility requirements imposed by K.A.R. 28-35-135(a)(2); K.A.R. 28-35-135(a)(5); K.A.R. 28-35-135(a)(6); K.A.R. 28-35-135(a)(8); K.A.R. 28-34-135(e)(2); and K.A.R. 28-34-135(d) require abortion clinics to purchase unnecessary supplies.

"In their motion for summary judgment, the defendants state, 'there is no evidence that any part of the Act or any regulation has had or will have any effect on a

21

woman's ability to decide whether to continue her pregnancy.' The defendants go on to say there 'is no evidence that any patient will have difficulty contacting another abortion provider in Kansas regarding her decision whether to continue her pregnancy if plaintiffs do not comply with the Act or the Regulations.'

"With respect to the defendants' second point, the plaintiffs have provided evidence that Dr. Nauser is one of the only clinicians in the area who possesses the experience and expertise required to work with women facing certain medical complications or fetal diagnoses. Further, the Supreme Court of Kansas has already determined that a restriction that 'threatens the already small number of providers willing to perform' certain abortions also impairs a person's natural rights. *Hodes & Nauser*, 309 Kan. at 672.

"Also important, as the plaintiffs illustrate in their responsive brief, 'a law infringes the right to abortion not only when it forces a person to seek care elsewhere.' Instead, restrictions that merely delay access to abortion impair a fundamental right. See *Hodes & Nauser*, 309 Kan. at 672 (finding impairment of a natural right due to the implication that S.B. 95 'will delay or completely prevent the exercise' of the fundamental right of abortion).

"As a result, it is not difficult for this Court to conclude the Challenged Laws infringe on a woman's right to access legal abortion services. See *Ragsdale v. Turnock*, 841 F.2d 1358, 1370 (7th Cir. 1988) (finding restrictions that caused delay and raised the costs of the services impaired the right at stake)."

Based on the infringement standard of proof in *Hodes I*, we conclude the Providers met their burden to show the Challenged Laws actually infringe on a woman's right to abortion, which is protected by section 1 of the Kansas Constitution Bill of Rights. Having done so, the burden shifts to the State to defend the law under strict scrutiny.

But before turning to strict scrutiny, we pause to address the dissent's cataclysmic premonition that a "massive swath of government action" will suddenly be put "on the chopping block of strict scrutiny" based on our holding that any degree of actual infringement on a fundamental right under section 1 triggers strict scrutiny. See *Stanek*, 318 Kan. at ___, slip op. at 88. Admittedly, it is hard to decide which of the dissent's scatter-shot claims warrant a response and which should simply be ignored given that its narrative strays so far afield from the constitutional framework we rely upon here. Yet the dissent's hyperbolic panic sounding a false alarm should not go unanswered.

The dissent warns that "government regulation *always* 'infringes' upon access to whatever good or service is being regulated," which means from this point forward all government regulation necessarily will be subject to strict scrutiny analysis and "most of the laws governments enact will fail a strict scrutiny analysis." *Stanek*, 318 Kan. at ___, slip op. at 81, 85. Suggesting the courthouse doors are now wide open to litigants bringing suit for the slightest infringement on access to goods and services that may marginally be related to personal autonomy, the dissent predicts a future without regulations governing medical procedures, food supplies, restaurants, drug use and possession, tattoos and piercings, use of car seat belts, motorcycle helmets, beauty and barber services, student vaccinations, assisted suicide, self-administration of medication by students, and public nudity.

First, it has been over five years since we adopted this infringement standard in our section 1 constitutional framework, and the dissent's dire prediction that countless Kansas regulations will be challenged and struck down for failing strict scrutiny analysis has failed to materialize.

23

Second, the dissent's prediction is based on a faulty underlying premise: that our decision in *Hodes I* broadly declares all activities related, however tangentially, to personal autonomy are protected under section 1. To arrive at this conclusion, the dissent interprets our holding in *Hodes I* as unlimited in scope, when in fact the opposite is true: we performed our section 1 analysis in *Hodes I* in the specific context of deeply personal reproductive health decisions, the profound significance of which directly affects a woman's entire lifespan. In doing so, this court conducted an exhaustive review of our founding documents, the historical record, and relevant scholarship on the meaning and scope of natural rights. See *Hodes I*, 309 Kan. at 623-46. Ultimately, this court held that section 1 guarantees women, like men, the inalienable natural right to personal autonomy, which includes the fundamental right to an abortion:

> "At issue here is the inalienable natural right of personal autonomy, which is the heart of human dignity. It encompasses our ability to control our own bodies, to assert bodily integrity, and to exercise self-determination. It allows each of us to make decisions about medical treatment and family formation, including whether to bear or beget a child. For women, these decisions can include whether to continue a pregnancy. Imposing a lower standard than strict scrutiny, especially mere reasonableness, or the dissent's 'rational basis with bite'—when the factual circumstances implicate these rights because a woman decides to end her pregnancy—risks allowing the State to then intrude into all decisions about childbearing, our families, and our medical decision-making. It cheapens the rights at stake. The strict scrutiny test better protects these rights. [Citation omitted.]" 309 Kan. at 671.

In an effort to justify its interpretation of the *Hodes I* holding as unlimited in scope, the dissent attempts to draw a false equivalence between *any activity* involving one's body and the intimate, personal, and profound act of deciding to have an abortion. In doing so, the dissent completely ignores the fact that this court's analysis in *Hodes I*

24

examined the inalienable natural right to personal autonomy in the specific context of abortion, which necessarily limited the scope of its holding. Without a similar legal analysis to determine whether the activities posited by the dissent are included in the meaning of personal autonomy as contemplated by section 1, the dissent's claim that laws infringing on those activities will be subject to strict scrutiny is specious at best. As the *Hodes I* court demonstrated of the right to abortion, each asserted right must be carefully examined and evaluated independently in the context of its own unique implications on an inalienable natural right found under section 1. See *Hodes I*, 309 Kan. at 623-46.

For example, the dissent sarcastically asks, "Surely the government does not have a compelling interest in who trims my beard?" *Stanek*, 318 Kan. at ___, slip op. at 87. The dissent trivializes and attempts to minimize the fundamental nature of a woman's decision to continue or terminate a pregnancy by comparing it to a man's decision to grow or trim a beard. This facetious comparison is both inappropriate and denigrating to women faced with decisions between childbirth and abortion, a decision we hope the dissent would agree is "'fraught with specific physical, psychological, and economic implications of a uniquely personal nature for each woman.'" *Hodes I*, 309 Kan. at 647 (quoting *In re T.W.*, 551 So. 2d 1186, 1193 [Fla. 1989]).

Because of the unique and profound attributes of the right to abortion and because denying this right "would severely limit" a woman's inalienable natural right to personal autonomy protected under section 1 of the Kansas Constitution Bill of Rights, the *Hodes I* court held—in the context of the right to abortion, which was the specific issue presented for decision—that the right to abortion is a fundamental right deserving of strict scrutiny protection. 309 Kan. at 647, 669, 681. See also 309 Kan. at 685 (Biles, J., concurring) (quoting *Women of the State of Minn. v. Gomez*, 542 N.W.2d 17, 27 [1995]

["We can think of few decisions more intimate, personal, and profound than a woman's decision between childbirth and abortion."]). The limited scope of the *Hodes I* holding is evident from the very outset of that decision in the synopsis, which we recite here:

> "Section 1 of the Kansas Constitution Bill of Rights provides: 'All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness.' We are now asked: Is this declaration of rights more than an idealized aspiration? And, if so, do the substantive rights include a woman's right to make decisions about her body, including the decision whether to continue her pregnancy? We answer these questions, 'Yes.'

> "We conclude that, through the language in section 1, the state's founders acknowledged that the people had rights that preexisted the formation of the Kansas government. There they listed several of these natural, inalienable rights—deliberately choosing language of the Declaration of Independence by a vote of 42 to 6.

> "Included in that limited category is the right of personal autonomy, which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows a woman to make her own decisions regarding her body, health, family formation, and family life—decisions that can include whether to continue a pregnancy. Although not absolute, this right is fundamental. Accordingly, the State is prohibited from restricting this right unless it is doing so to further a compelling government interest and in a way that is narrowly tailored to that interest." 309 Kan. at 613-14.

Therefore, we reaffirm today what this court held above in *Hodes I*: the inalienable natural right of personal autonomy under section 1 of the Kansas Constitution Bill of Rights allows a woman to make her own decisions regarding whether to have an abortion and, although not absolute, this right is fundamental.

26

Accordingly, laws that actually infringe on the right to abortion, regardless of the degree of infringement, are subject to strict scrutiny. 309 Kan. at 614.

### 3. *Strict scrutiny*

Once a plaintiff proves an actual infringement of a protected right under section 1, the court presumes the law is unconstitutional and the burden shifts to the State to defend the challenged law under strict scrutiny. *Hodes I*, 309 Kan. at 669. Strict scrutiny requires the State to prove (1) the existence of a compelling government interest, (2) its actions further that compelling interest, and (3) its actions do so in a way that is narrowly tailored. 309 Kan. at 670.

### a. *Compelling government interest*

In both *Hodes I* and *Hodes II*, we described a compelling interest as "one that is 'not only extremely weighty, possibly urgent, but also rare—much rarer than merely legitimate interests and rarer too than important interests.'" *Hodes I*, 309 Kan. at 663; *Hodes II*, 318 Kan. at ___, slip op. at 16. The United States Supreme Court has described a compelling interest as one "of the highest order." *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972).

Unfortunately, these descriptive modifiers provide little, if any, guidance on how to determine whether an interest articulated by the State is a compelling one under the strict scrutiny framework. See, e.g., *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 186, 143 S. Ct. 2141, 216 L. Ed. 2d 857 (2023) (explaining that compelling interests subject to strict scrutiny need to be amenable to meaningful judicial review, not simply "commendable goals"). Courts across the

country, including ours, generally appear to deal with the absence of a clear standard of proof either by summarily deciding the interest is compelling or by "assuming without deciding" the articulated government interest is compelling. These courts then decide the constitutional challenge as a question of whether the State proved the challenged laws further the government interest in a way that is narrowly tailored. See, e.g., *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 193, 137 S. Ct. 788, 197 L. Ed. 2d 85 (2017) (assuming without deciding that compliance with the Voting Rights Act is a compelling government interest); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015) (assuming without deciding that preserving the Town's aesthetic appeal and traffic safety are compelling governmental interests); *Missourians for Fiscal Accountability v. Klahr*, 892 F.3d 944, 952 (8th Cir. 2018) (assuming without deciding that preventing violation of campaign committee deadline is a compelling government interest); *Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548, 559 (4th Cir. 2013) (assuming without deciding that preserving agricultural land, water quality, and open space and managing traffic and noise in the rural density transfer zone is a compelling government interest); *Green Party of Connecticut v. Garfield*, 616 F.3d 189, 213 (2d Cir. 2010) (assuming without deciding that preventing contractors and lobbyists from bundling contributions is a compelling government interest); *Bey v. Rasawehr*, 161 Ohio St. 3d 79, 94, 161 N.E.3d 529 (2020) (assuming without deciding that protecting civil-stalking victims from fear of imminent physical harm or mental distress is a compelling government interest); *State v. Planned Parenthood of the Great NW*, 436 P.3d 984, 1004 (Alaska 2019) (assuming without deciding ensuring financial viability of Medicaid is a compelling government interest); *Wagner v. City of Garfield Heights*, 675 Fed. Appx. 599, 607 (6th Cir. 2017) (unpublished opinion) (assuming without deciding that aesthetic appeal and traffic safety is a compelling government interest).

In its appellate brief, the State cites to its motion for summary judgment to assert the Challenged Laws are justified by two compelling government interests: (1) protecting maternal health and safety and (2) regulating the medical profession. But unlike the argument submitted to us, the State's motion for summary judgment to the district court asserted only one compelling government interest: the health and safety of women.

> "In the abortion context specifically, the [United States] Supreme Court has stated repeatedly that the State has a legitimate interest from the outset of pregnancy in protecting the health of the woman. . . .
>
> "The State's interest in protecting the health of a pregnant woman also arises in the context of the State's longstanding interest in regulating the medical profession. [Citations omitted.]"

Following the State's lead, the district court found the State was asserting the health and safety of pregnant women as its only compelling government interest, with the interest in regulating the medical profession as an associated factor:

> "The defendants maintain the State has a valid interest in protecting the health of pregnant women, which is encompassed in its broader interest in promoting the health and safety of all its residents. The defendants further claim the State's interest in protecting the health of pregnant women is linked with its 'longstanding interest in regulating the medical profession.'"

As for maternal health and safety, the district court relied on an Iowa Supreme Court decision to summarily announce that "[t]here is little question the health of pregnant women or non-pregnant women—and of Kansas residents, more generally—is a

compelling interest." (Citing *Planned Parenthood of the Heartland v. Reynolds ex rel. State*, 915 N.W.2d 206, 239-40 [Iowa 2018], *overruled by Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 975 N.W.2d 710 [Iowa 2022].) But the court held the State failed to meet its burden to establish that regulating the medical profession—as an associated factor in the context of abortion care to protect women's health and safety—is a compelling state interest.

While the State's articulated interest in protecting maternal health may be compelling as a theoretical matter under the *Hodes I* and *Hodes II* definition, we question whether an interest articulated in the abstract is enough to establish the compelling nature of that interest under the strict scrutiny framework. Requiring only a theoretical government interest creates the potential for arbitrary results when courts decide under strict scrutiny whether the interests are compelling—i.e., extremely weighty, possibly urgent, and rare. But because the district court did not make any factual findings about the compelling nature of the State's interest in protecting maternal health, we will assume without deciding that protecting maternal health may be a compelling state interest.

Like maternal health, the government regulation of the medical profession—as an associated factor in the context of abortion care to protect women's health—also may be compelling as a theoretical matter. But because the district court found the State failed to meet its burden in this regard and did not make any factual findings about the compelling nature of the State's interest on this issue, we will assume without deciding that regulation of the medical profession—as an associated factor in the context of abortion care to protect women's health—may be a compelling state interest.

30

b. *Furthering the compelling interest*

Once the government has established an interest as compelling, it must also show its regulation *furthers* that compelling interest. *Hodes II*, 318 Kan. at ___, slip op. at 17 (citing *Holt v. Hobbs*, 574 U.S. 352, 362-64, 135 S. Ct. 853, 190 L. Ed. 2d 747 [2015] [strict scrutiny requires government action "actually further[ed]" asserted interest]; *Carey v. Population Servs., Int'l*, 431 U.S. 678, 691, 97 S. Ct. 2010, 52 L. Ed. 2d 675 [1977] [legislation could not withstand strict scrutiny because it did not serve the State's asserted interests]; Galloway, *Basic Substantive Due Process Analysis*, 26 U.S.F. L. Rev. 625, 640 (1992) ["The 'compelling interest' prong of strict scrutiny requires not only that the government have a compelling interest, but also that the government's conduct 'further' that interest."]).

To satisfy that burden, the government must show its regulations "'further the identified state interest that motivated the regulation not merely in theory, but in fact.'" *Hodes I*, 309 Kan. at 696 (Biles, J., concurring; quoting *Planned Parenthood of the Heartland*, 915 N.W.2d at 239-40); *Ernest v. Faler*, 237 Kan. 125, 138, 697 P.2d 870 (1985) (statute found unconstitutional because "the legislative means selected does not have a real or substantial relation to the objective sought"); Galloway, 26 U.S.F. L. Rev. at 638 (to show government conduct furthers compelling interest under strict scrutiny framework, "the conduct must be a substantially effective means for advancing that interest").

In deciding whether regulations are, in fact, substantially related to the objective sought and are a substantially effective means for advancing the government's identified interest, the court's "findings must be based on evidence, including medical evidence, presented in judicial proceedings. Mere deference to legislative or administrative findings

31

or stated goals would be insufficient." *Hodes I*, 309 Kan. at 700 (Biles, J., concurring); see also *Hellerstedt*, 579 U.S. at 582 (legislation did not further an interest in patient health when the State failed to provide evidence of a "significant health-related problem that the new law helped to cure"). As we stated in *Hodes II*:

> "Showing that its action furthers its asserted interest can be crucial to the government's success. In *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 627, 136 S. Ct. 2292, 195 L. Ed. 2d 665 (2016), *abrogated by Dobbs*, 597 U.S. 215, the government's failure to produce evidence showing that abortion legislation furthered an interest in 'maternal health' was key to the Supreme Court's conclusion that the law was unjustified when compared to the burden it created on the right to abortion. There, the government argued that legislation requiring doctors to have admitting privileges to hospitals to provide abortions did not advance any interest in patient health when the evidence showed that abortion '"was extremely safe with particularly low rates of serious complications and virtually no deaths occurring on account of the procedure."' *Hellerstedt*, 579 U.S. at 610-11. Legislation requiring all abortion facilities to meet surgical-center standards also failed to further an interest in maternal health because the evidence made it clear that the requirement would not create '"better care or . . . more frequent positive outcomes."' *Hellerstedt*, 579 U.S. at 582. Although the Court in *Hellerstedt* was applying a form of the undue burden test, its evidence-based approach to the furtherance question provides an instructive tool for our application of the same question within the strict scrutiny test. See *Hodes [I]*, 309 Kan. at 701 (Biles, J., concurring) (opining that test in *Hellerstedt* captures strict scrutiny test described by majority)." *Hodes II*, 318 Kan. at ___, slip op. at 17-18.

In this case, the district court held the State failed to meet its evidentiary burden to show the Challenged Laws further its stated interest in protecting the health and safety of women. In support of this holding, the court noted (1) the State provided no evidence to show the existence of a health- or safety-related problem the Challenged Laws help to cure; (2) the State provided no evidence to show why the Challenged Laws are needed

32

above and beyond existing Board of Healing Arts regulations governing the practice of medicine at medical offices and clinics that perform abortions; and (3) the State provided no evidence to show why medical offices and clinics performing abortions need targeted restrictions when other clinics performing comparable or more risky medical procedures do not require the same added oversight.

On appeal, the State claims the district court erred in finding it failed to meet its burden. Yet the State's argument is limited to two sentences addressing the duplicative nature of the regulations:  "But the fact that other regulations currently in place also further these interests does not mean that additional regulations do not. The Clinic Regulations will make abortions safer through more targeted regulation." Notwithstanding the State's concession on redundancy, the dissent paints a picture suggesting abortion procedures are somehow less regulated than other comparable medical procedures. But there is no evidentiary support for that, which the State concedes. The district court's findings leave no room for doubt that the Challenged Laws impose medically unnecessary requirements for no apparent reason other than to burden a particular type of health care.

Nor does the State assert—let alone provide medical evidence to establish—that (1) there is a "significant health-related problem" the Challenged Laws "helped to cure" or (2) the Challenged Laws provide any more protection than that provided by the existing Board of Healing Arts regulations governing the practice of medicine at medical offices and clinics like the one here. See *Hellerstedt*, 579 U.S. at 610, 615. Indeed, there simply is no evidence in the record from which to conclude the Challenged Laws provide any necessary benefit to the health and safety of women seeking abortions in Kansas. The State failed to meet its evidentiary burden to establish the Challenged Laws, individually or collectively, further its interest in protecting the health and safety of women or in

33

regulating the medical profession as it relates to maternal health. Without evidence to establish the Challenged Laws further the State's identified compelling interests, the statutory scheme making up the Challenged Laws does not survive strict scrutiny and is constitutionally infirm.

Although this effectively ends our inquiry, our review of the summary judgment record shows the Providers presented uncontroverted evidence to prove many provisions within the Challenged Laws do *not* further the State's interest in protecting maternal health or in regulating the medical profession as it relates to maternal health. We review that evidence below. For ease of reference, we group the statutes and regulations by category of restriction imposed and then cite evidence from the record undermining the State's assertion that the requirement furthers a compelling state interest.

*Medication-in-person requirement*

*Requirement*:  If used to induce an abortion, the drug mifepristone must be administered to the patient in the physical presence of the physician. K.S.A. 65-4a10(b).

Evidence undermining the State's claim that this requirement furthers its interest in maternal health:

- Experts, *including the State's expert*, agree there is no reason for a clinician to be physically present when mifepristone is administered to patients for any reason.

- The requirement does not apply (1) when clinicians provide mifepristone for a purpose other than inducing an abortion, including when the drug is provided

to manage miscarriage or (2) when clinicians provide mifepristone in a medical office, clinic, or facility performing less than five first-trimester abortions per month and no second- and third-trimester abortions. See K.S.A. 65-4a01(g).

*Gestational age 22 weeks or more*

*Requirement*: Except in the case of medical emergency, an abortion performed when the gestational age of the unborn child is 22 weeks or more must be performed in a licensed hospital or ambulatory surgical center. K.S.A. 65-4a07.

Evidence undermining the State's claim that this requirement furthers its interest in maternal health:

- Plaintiffs' experts agree abortion procedures during the second trimester (weeks 14 to 27) may be safely performed in a properly equipped and staffed office setting. There is no medical reason to require different settings for such a procedure. The State does not present any evidence to the contrary.

*Waivers and exemptions*

*Requirement*: Medical offices or clinics providing abortion care are not eligible to receive a waiver under the Challenged Laws. K.S.A. 65-4a02(g).

Evidence undermining the State's claim that this requirement furthers its interest in maternal health:

- Hospitals and ASCs providing abortion care are eligible for a waiver of requirements under the Challenged Laws when the KDHE determines such waiver "will have no significant adverse impact on the health, safety or welfare of the patients." K.S.A. 65-4a02(g).

*Requirement*: Medical offices, clinics, or facilities performing five or more first-trimester abortions per month or any second- and third-trimester abortions, excluding any abortion performed due to a medical emergency, must comply with the Challenged Laws. K.S.A. 65-4a01(g).

Evidence undermining the State's claim that this requirement furthers its interest in maternal health:

- Medical offices, clinics, or facilities performing less than five first-trimester abortions per month and no second- and third-trimester abortions are exempt from complying with the Challenged Laws. K.S.A. 65-4a01(g).

*Staffing*

*Requirement*: Only physicians can perform an abortion. K.S.A. 65-4a10(a).

Evidence undermining the State's claim that this requirement furthers its interest in maternal health:

- Clinicians who are not physicians, such as certified nurse midwives, may provide care at a maternity or birth center in connection with a pregnancy

36

deemed low risk for a poor outcome. See K.S.A. 65-503 et seq.; K.A.R. 28-4-1300 et seq.

*Requirement*: Any physician performing an abortion must have admitting privileges at a hospital within 30 miles of the facility. K.S.A. 65-4a08(b); K.S.A. 65-4a09(d)(3); K.A.R. 28-34-132(b)(2).

Evidence undermining the State's claim that this requirement furthers its interest in maternal health:

- The State's designated KDHE representative, Joseph Kroll, testified in his deposition that a physician performing an abortion can send a patient to a hospital even if the physician does not have admitting privileges.

- The State's other designated KDHE representative, Angela Jirik, testified in her deposition that existing regulations governing ASCs provide two options for patient transfers: (1) a transfer agreement with a hospital or (2) a physician's admitting privileges at a hospital. Neither of these options has a requirement the hospital be located within 30 miles of the ASC. See K.A.R. 28-34-52b(g).

- Preexisting Kansas Board of Healing Arts regulations require a physician performing any office-based surgery or special procedure to have (1) a plan for the timely and safe transfer of patients to a prespecified medical care facility within a reasonable proximity if extended or emergency services are needed, (2) a transfer agreement with the specified medical care facility, or (3) admitting privileges at the specified medical care facility. K.A.R. 100-25-3(e)(1).

37

*Requirement*: A physician performing a pelvic exam must have another staff person in the room, even if the physician performing the exam is a female. K.S.A. 65-4a09(d)(4); K.A.R. 28-34-137(c). Only a licensed health professional can provide postoperative monitoring and care. K.S.A. 65-4a09(d)(5). A licensed health professional must make a good-faith effort to contact a patient within 24 hours after a procedure to assess recovery. K.S.A. 65-4a09(g)(8); K.A.R. 28-34-141(a). Medications can be administered to patients only by a facility physician or a facility health professional. K.A.R. 28-34-135(m). Both a physician and at least one health professional must be available to each patient throughout the abortion procedure, even when no anesthesia is used. K.A.R. 28-34-138(c). Health professionals must monitor patients' vital signs throughout the abortion procedure, even when no anesthesia is used. K.A.R. 28-34-138(f).

> Evidence undermining the State's claim that this requirement furthers its interest in maternal health:

> - None of these provisions are included in licensing regulations governing an ASC, where care similar to, or more complex than, abortion is performed.

> - Experts, *including the State's expert*, agree there is no justification for applying these provisions solely to facilities at which abortion care is provided.

> - Experts, *including the State's expert*, agree none of these restrictions are necessary for safe abortion care.

*Requirement*: Medical offices, clinics, or facilities performing five or more first-trimester abortions per month or any second- and third-trimester abortions, excluding any abortion

38

performed due to a medical emergency, must comply with specific and itemized rules and regulations concerning sanitation, housekeeping, maintenance, staff qualifications, medical screening questions and evaluations of patients, type and number of required supplies and equipment, medical records and incident reporting, laboratory and recovery room procedures, the abortion procedure itself, the physical facility, and reasonable efforts to secure patient follow-up care. K.S.A. 65-4a09.

Evidence undermining the State's claim that these requirements further its interest in maternal health:

- Medical offices, clinics, or facilities performing less than five first-trimester abortions per month and no second- and third-trimester abortions are exempt from complying with K.S.A. 65-4a09. See K.S.A. 65-4a01(g).

- Out of the 50+ separate sub-subsections in K.S.A. 65-4a09 setting forth specific and itemized rules and regulations governing abortion care facilities as listed above, only 4 have a similar provision in the licensing regulations governing ASCs, where care similar to, or more complex than, abortion is performed.

    o Compare K.S.A. 65-4a09(b)(11) (In an abortion care facility, there must be "adequate areas for the secure storage of medical records and necessary equipment and supplies.") with K.A.R. 28-34-57(i) (In an ASC, "[a]dequate space, facilities, and equipment shall be provided for completion and storage of medical records.").

39

o  Compare K.S.A. 65-4a09(d) (in abortion care facility, requiring designation of a medical director, demonstrable competence of physicians performing procedures, availability of physician with admitting privileges at an accredited hospital located within 30 miles of the facility is available; another individual present in room during pelvic exam; registered nurse, nurse practitioner, and licensed practical nurse or physician assistant be present and remain at facility when abortions are performed to provide postoperative monitoring and care until each patient who had an abortion that day is discharged) with K.A.R. 28-34-53(h)(2) ("The governing authority [of an ASC] shall ensure that the ambulatory surgical center . . . has an adequate number of qualified personnel.").

o  Compare K.S.A. 65-4a09(d)(5) and (g)(3), (4) (in abortion care facility, requiring a registered nurse, nurse practitioner, licensed practical nurse or physician assistant to be present and remain at the facility when abortions are performed to provide postoperative monitoring and care until each patient who had an abortion that day is discharged; a licensed health professional trained in the management of the recovery area and capable of providing basic cardiopulmonary resuscitation and related emergency procedures to remain on the premises of the facility until all patients are discharged; a physician or a nurse who is advanced in cardiovascular life support certified to remain on the premises of the facility until all patients are discharged and to facilitate the transfer of emergency cases if hospitalization of the patient or viable unborn child is necessary; and a physician or nurse to be readily accessible and

40

available until the last patient is discharged) with K.A.R. 28-34-50(b) ("Before discharge from an [ASC], each patient shall be evaluated by a physician for proper anesthesia recovery.").

- o Compare K.S.A. 65-4a09(e) (in an abortion care facility, requiring medical screening and evaluation of each patient to document full medical history, including allergies, obstetric and gynecologic history, past surgeries, full physical examination, appropriate laboratory tests including urine and blood or ultrasound examination, anemia test, and Rh typing unless written documentation provided) with K.A.R. 28-34-57(a), (d) (ASC patient medical records shall contain the following information, *if applicable*: patient identification, consent, and history; lab, radiology, anesthesia, surgical, tissue, consultation, and progress reports; doctor orders; a description of care given to patient based on the type of surgery; the signature or initials of authorized personnel on notes or observations; the final diagnosis; the discharge summary; the discharge instructions to the patient; a copy of transfer form; and the autopsy findings).

*Post-procedure*

*Requirement*: First-trimester abortion patients must be kept in recovery at least 30 minutes, even when no sedation is used. K.A.R. 28-34-139(a)(3)(A). The medical office must have a recovery area with a nurse's station providing visual observation of each patient, even when no sedation is used. K.S.A. 65-4a09(g); K.A.R. 28-34-133(b)(7)(A). Reasonable efforts must be made to ensure the patient returns 12 to 18 days after any

41

abortion for a subsequent examination so the physician can confirm the pregnancy terminated. A brief description of the efforts made, including the date, time, and identification by name of the staff member must be included in the patient's medical record. K.S.A. 65-4a10(c). Any follow-up visit after a pregnancy termination must include a urine pregnancy test, even if the facility uses an ultrasound or physical exam to confirm termination of pregnancy in the follow-up visit. K.A.R. 28-34-141(b)(3).

Evidence undermining the State's claim that these requirements further its interest in maternal health:

- State law imposes no minimum recovery times for any other patients who obtain other care in Kansas. For example, there is no minimum recovery time for a patient who has had a first-trimester dilatation and curettage procedure in the context of miscarriage care, regardless of the facility in which it is performed.

- Experts, *including the State's expert*, agree there is no medical reason for imposing minimum recovery times on patients who have had abortions, but not patients who have obtained other care—including patients who have had essentially the same procedure to complete a miscarriage.

- None of these provisions apply to ASCs, where care similar to, or more complex than, abortion is performed.

- Experts, *including the State's expert*, agree there is no justification for applying these provisions solely to facilities at which abortion care is provided.

- Experts, *including the State's expert*, agree none of these restrictions are necessary for safe abortion care.

*Mandated disclosure of medical waste contractor*

*Requirement*:  A facility must identify the biomedical waste company it contracts with and submit written documentation of medical waste removal procedures. K.A.R. 28-34-127(c)(3).

Evidence undermining the State's claim that these requirements further its interest in maternal health:

- State law does not require non-abortion medical offices to disclose and provide written documentation of their arrangements with biomedical waste companies. See K.A.R. 28-29-27 et seq.

*Equipment*

*Requirement*:  Abortion facilities must maintain a stock of specific equipment including child-size face masks, catheters in various sizes, child-size oral airways, child-size nasal cannulas, nasogastric tubes, and intraosseous needles. K.A.R. 28-34-135(c), (d), (e).

Evidence undermining the State's claim that these requirements further its interest in maternal health:

- None of these provisions apply to health care facilities providing similar or more complex care than abortion. See, e.g., K.A.R. 28-34-50 et seq. (ASC regulations).

- Several provisions of the Challenged Laws require abortion facilities to buy unnecessary equipment and supplies that will go unused, expire, and need to be purchased again.

*Medical records*

*Requirement*: Abortion facilities must give KDHE broad access to patient medical records, including patient-identifying information. K.A.R. 28-34-144(c).

Evidence undermining the State's claim that this requirement furthers its interest in maternal health:

- State law does not require non-abortion medical offices to give KDHE broad access to patient medical records, including patient-identifying information. See K.A.R. 100-25-1 et seq.

- Kansans seeking abortion have a strong interest in maintaining the confidentiality of their medical records. Many CWH patients, particularly those obtaining abortions, would experience substantial stress and anxiety if they learned their identities and medical records would be open to extensive review by KDHE employees. The risk of exposure of patients' medical records could deter them from accessing abortion at CWH or in the State.

44

*Board of Pharmacy registration*

*Requirement*:  Abortion facilities maintaining a stock of controlled drugs must register with the Board of Pharmacy. K.A.R. 28-34-135(n).

Evidence undermining the State's claim that this requirement furthers its interest in maternal health:

- Kansas-licensed clinicians who practice in non-abortion medical offices are permitted to maintain and administer controlled drugs, without registering with the Board of Pharmacy, so long as they are registered with the United States Drug Enforcement Administration. See K.S.A. 65-1635. Controlled drugs used in connection with abortion care are the same as those used in other gynecological procedures performed at non-abortion medical offices (or medical offices providing less than five first-trimester abortions) in the state.

*Unannounced inspections*

*Requirement*:  KDHE must make at least two inspections of an abortion facility each calendar year to implement and enforce K.S.A. 65-4a01 through K.S.A. 65-4a12, with at least one inspection made without providing notice to the facility, during business hours. K.S.A. 65-4a05(a).

Evidence undermining the State's claim that this requirement furthers its interest in maternal health:

45

- Pre-existing Kansas Board of Healing Arts regulations require the Board to enforce regulations governing the practice of medicine by making all necessary investigations relative to such enforcement. K.S.A. 65-2864.

- State law does not require unannounced inspections during business hours of other KDHE-licensed facilities, non-abortion medical offices, or medical offices providing less than five first-trimester abortions and no second or third trimester abortions. See K.S.A. 65-433 (stating that KDHE "shall make or cause to be made such inspections and investigations as deemed necessary").

*Severe penalties*

*Requirement*: The Challenged Laws subject abortion facilities to severe criminal and licensure penalties. See K.S.A. 65-4a06(a), (f), and K.S.A. 65-4a08.

Evidence undermining the State's claim that this requirement furthers its interest in maternal health:

- ASC and hospital regulations do not include criminal penalties, civil liability, or fines for non-compliance, and KDHE testified that its current enforcement mechanisms are sufficient.

- These severe penalties do not apply to the provision of care in medical offices where comparable care is provided. See K.S.A. 65-2836; K.S.A. 65-2837 (stating grounds for clinician license revocation).

46

In sum, all experts—including the State's expert—agree existing abortion care is extremely safe and comparable in terms of safety to gynecological and non-gynecological procedures to which the Challenged Laws have no application. The Providers point out the State identified no health or safety incident in the nearly 10 years since the Challenged Laws were enjoined, let alone any incident that the Challenged Laws would have addressed.

As we held above, the Challenged Laws do not survive strict scrutiny and are unconstitutional because the State failed to meet its evidentiary burden to establish the Challenged Laws, individually or collectively, further its interest in protecting the health and safety of women or in regulating the medical profession as it relates to maternal health. Our holding is supported by uncontroverted evidence in the record that affirmatively contradicts—for many provisions—the State's claim that those provisions further the State's identified compelling interests. Our holding makes it unnecessary to address the State's claim that it narrowly tailored the Challenged Laws to serve compelling state interests.

B. Severability

The district court struck the Challenged Laws in their entirety, finding they imposed a comprehensive and interdependent statutory and regulatory scheme that could not be severed. The State claims the district court erred by ignoring the statute's severability clause and striking down the Challenged Laws in their entirety. The State urges us to reverse the district court's severability decision, sever any unconstitutional provision, and let the rest of the Challenged Laws stand.

The touchstone for severability is legislative intent. "[F]or determining legislative intent, the severability clause 'is an aid merely; not an inexorable command.'" *Gannon v. State*, 304 Kan. 490, 520, 372 P.3d 1181 (2016) (citing *Dorchy v. State of Kansas*, 264 U.S. 286, 290, 44 S. Ct. 323, 68 L. Ed. 686 [1924]). Under our well-established two-part test for severability, the court may sever the unconstitutional provisions from the statute and leave the remainder in force and effect "'[i]f from examination of a statute it can be said that [1] the act would have been passed without the objectionable portion and [2] if the statute would operate effectively to carry out the intention of the legislature with such portion stricken.'" *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1023, 850 P.2d 773 (1993) (quoting *Felten Truck Line, Inc. v. State Board of Tax Appeals*, 183 Kan. 287, 300, 327 P.2d 836 [1958]). In *Thompson*, we also reaffirmed this century-old standard:

> """While it is undoubtedly true that a statute may be constitutional in one part, and unconstitutional in another, yet this rule obtains only where the two parts are separate and independent; and where they are so related that the latter is a condition of, a compensation for, or an inducement to, the former, or where it is obvious that the legislature, having respect to opposing rights and interests, would not have enacted one but for the other, then the unconstitutionality of the latter avoids the entire statute.""" 252 Kan. at 1024 (quoting *In State, ex rel., v. Consumers Warehouse Market*, 185 Kan. 363, 372, 343 P.2d 234 [1959], which in turn quoted *Central Branch Union Pac. R.R. Co. v. Atchison, T. & S.F. R.R. Co.*, 28 Kan. 453, Syl. ¶ 1, 1882 WL 1067 [1882]).

According to the State, the Legislature's stated purpose in enacting the abortion provider facility licensing statutes was to protect maternal health and regulate the medical profession as it relates to maternal health. In the preceding section, we held the Challenged Laws unconstitutional in their entirety because the State failed to meet its evidentiary burden under strict scrutiny to establish the Challenged Laws, individually or collectively, further its stated interest. Under our severability test, we are now required to

48

ask (1) whether the Legislature would have passed the Challenged Laws without the objectionable portions and (2) whether the Challenged Laws would carry out the intention of the Legislature if the objectionable portions were severed. But these questions become irrelevant when, as here, the entire statutory scheme is objectionable based on a lack of evidence to establish *any* of the Challenged Laws further a compelling state interest.

Yet we found uncontroverted evidence in the record affirmatively contradicting the claim that the Challenged Laws furthered the State's interest for these provisions: K.S.A. 65-4a01(g), K.S.A. 65-4a02(g), K.S.A. 65-4a05(a), K.S.A. 65-4a06(a) and (f), K.S.A. 65-4a07, K.S.A. 65-4a08, K.S.A. 65-4a09, K.S.A. 65-4a10(a)-(c). If we were to use this as a benchmark for identifying the objectionable provisions of the Challenged Laws, we would be left with these provisions for which there was no affirmative evidence in the record contradicting the State's unsubstantiated claim that they further its stated compelling interest:

- K.S.A. 65-4a01 (except for subsection [g], this provision defines words and phrases in the abortion licensing statutes, usually by cross-referencing other statutes);

- K.S.A. 65-4a02 (except for subsection [g], this provision addresses the process for seeking licensure, the associated fees, and the length a license is valid);

- K.S.A. 65-4a03 (this provision addresses the procedure for annual license renewal);

- K.S.A. 65-4a04 (this provision discusses facility naming conventions, how changes in ownership can affect licensure, and what to do when a facility changes ownership);

- K.S.A. 65-4a05(b) (this subsection protects from public disclosure patient identification information received by KDHE through inspections or otherwise);

- K.S.A. 65-4a06(b)-(e) (these subsections grant KDHE the authority to deny, suspend, or revoke a facility's license upon a finding by KDHE that the facility violated the substantive laws, rules, or regulations relating to the operation or maintenance of a facility);

- K.S.A. 65-4a11 (this provision states that nothing in the abortion licensing statutes should be construed as creating or recognizing a right to abortion); and

- K.S.A. 65-4a12 (this provision is the general severability clause).

Applying our two-step severability test, we would find it improper to sever. When separated out, the contradicted provisions generally appear to be the more substantive provisions of the abortion facility licensing statutory scheme and the uncontradicted provisions appear to be the procedural mechanisms for administering and enforcing the substantive provisions. As for the first step, we doubt the Legislature would have passed a procedural mechanism for administering and enforcing a substantive licensing scheme without any underlying substantive licensing requirements. Doing so would render the procedural mechanisms meaningless, and we presume the Legislature does not intend to enact meaningless legislation. *In re Marriage of Traster*, 301 Kan. 88, 98, 339 P.3d 778

(2014). As for the second step of the test, the procedural mechanisms for administering and enforcing a licensing scheme—without any underlying substantive facility requirements—would not carry out the Legislature's intent to regulate the safety of abortion facilities.

To recap, our two-step severability test is inapplicable when, as here, the entire statutory scheme is objectionable based on a lack of evidence to establish any of the Challenged Laws further a compelling state interest. But having identified the objectionable portions of the Challenged Laws in our analysis, we would find it improper to sever the objectionable portions because the Legislature would not have passed the Challenged Laws without them and, when severed, the remaining provisions would not carry out the Legislature's intent to regulate the safety of abortion facilities.

Having determined the abortion facility licensing statutory scheme is unconstitutional as a whole, the corresponding regulations are necessarily null and void because the KDHE has no power to implement regulations in the absence of an enabling statute.

## C. *Equal protection*

As its final argument, the State claims the district court erred in granting summary judgment to the Providers based on its finding that the Challenged Laws violate the equal protection provisions of the Kansas Constitution. But we need not address the State's challenge to the district court's alternative equal protection ruling because we affirm the district court's summary judgment decision on grounds that the State has failed to meet its evidentiary burden to establish the Challenged Laws further its stated compelling interests.

CONCLUSION

- The Providers met their burden to show the Challenged Laws infringe on the right to an abortion recognized in *Hodes I*, 309 Kan. 610.

- We assume without deciding that protection of maternal health and regulation of the medical profession as it relates to maternal health may be compelling state interests.

- We find the State failed to meet its evidentiary burden to show the Challenged Laws further its interests in protection of maternal health and regulation of the medical profession as it relates to maternal health.

- We find it improper to sever the unconstitutional substantive licensure requirements from the statute.

- We decline to address the equal protection issues.

- We affirm the district court's decision to grant summary judgment to the Providers.

Affirmed.

WALL, J., not participating.

52

* * *

ROSEN, J., concurring: Justice Wilson suggests in her concurrence that our decision "may be retreating" or "changing" the holding in *Hodes & Nauser, MDs, P.A. v. Schmidt*, 309 Kan. 610, Syl. ¶ 15, 440 P.3d 461 (2019) (*Hodes I*), holding that personal autonomy is "fundamental," and that we do so in an attempt to sneakily change the law and avoid the dissent's predictions. *Stanek*, 318 Kan. at ___, slip op. at 70-71. It does not. In the majority opinion, we explain that, in *Hodes I*, the court "equated its holding that personal autonomy is a natural inalienable right to one that personal autonomy is a fundamental right." 318 Kan. at ___, slip op. at 17. We reiterate "the right to abortion is subject to strict scrutiny because it is an exercise of the inalienable natural right of personal autonomy protected by section 1 of the Kansas Constitution Bill of Rights, which is a fundamental right." 318 Kan. at ___, slip op. at 17. Thus, we do not "change" the holding that personal autonomy is a fundamental right subject to strict scrutiny. Whether one describes a right as a natural one protected by section 1 or a fundamental one protected by section 1, the right receives rigorous protection under our Bill of Rights. No matter the label we give it, infringements of that right are subject to strict scrutiny.

I trust lower courts and their ability to follow the analytical path we laid out in *Hodes I* to decide whether a right falls within section 1's protective sphere. As we discuss in the majority opinion, if a litigant argues that the state has infringed the right to personal autonomy, a court will identify the interest at stake, analyze whether, like abortion, that interest has profound and unique attributes that bring it within section 1's meaning of personal autonomy. 318 Kan. at ___, slip op. at 15. If it does, infringements upon that right are subject to strict scrutiny. Lower courts have been analyzing and applying the decisions from this court and others for over a century. I have full confidence in their ability to continue.

53

* * *

BILES, J., concurring:  I concur in the majority's analysis and result without any reservation. I write separately only to discuss something not addressed by the majority decision—the dissent's misappropriation of my earlier concurrence in *Hodes & Nauser, MDs, P.A. v. Schmidt*, 309 Kan. 610, 682-706, 440 P.3d 461 (2019) (*Hodes I*). The dissent's offending paragraph from my perspective states:

> "The majority finds these regulations infringe upon the right to an abortion. In the language of our decision in *Hodes I*, the government has encroached upon the 'natural right of personal autonomy' protected by section 1, which 'is fundamental and thus requires applying strict scrutiny.' *Hodes I*, 309 Kan. 610, Syl. ¶ 15. Specifically, the majority notes that 'once a plaintiff proves an actual infringement—regardless of degree and even if the infringement is slight—the government's action is presumed unconstitutional and the burden shifts to the government to establish the requisite compelling interest and narrow tailoring of the law to serve it.' *Stanek*, 318 Kan. at ___, slip op. at 19. A legal standard one member of the majority recently firmly rebuffed. See *Hodes I*, 309 Kan. at 688, 692-93 (Biles, J., concurring) (arguing that the *Hodes I* majority 'simply toss[ed] around strict scrutiny nomenclature . . . and then hop[ed] for the best' and concluding that the majority's 'strict scrutiny jurisprudence will also have potentially unsettling ripple effects in other areas of Kansas law' because the standard is so 'vulnerable' to judges' 'subjective[]' opinions)." *Stanek*, 318 Kan. at ___, slip op. at 79.

Even a cursory review of my *Hodes I* concurrence cannot reasonably lead to the dissent's characterization, arrived at by assembling fragments of what I wrote in a 24-page concurrence. *Hodes I*, 309 Kan. at 682-706. But let's set aside comparisons to Mary Shelley's classic novel and get to the point. The central theme to my *Hodes I* concurrence jumps out in its opening paragraph—something I would think is hard to miss:

54

"I concur in the result. I do so because the majority decision provides little guidance for applying strict scrutiny—very rarely used in Kansas—as a meaningful constitutional measure for this legislation. And what guidance it does provide confuses rather than clarifies. For all practical purposes, the majority leaves the trial court to fend for itself. In my view, an issue as troubling as this one requires us to be more instructive. Toward that end, I suggest what our state test should look like using an evidence-based analytical model taken from *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 136 S. Ct. 2292, 195 L. Ed. 2d 665 (2016)." 309 Kan. at 682-83.

My thesis was—and still is—that the *Hodes I* majority at that point in the litigation did not sufficiently guide the district court on remand in how to apply its strict scrutiny standard. So I advocated for an evidence-based analysis to cut through the State's rhetoric that cloaks its stunning lack of proof for an issue of such consequence. And, of course, the *Stanek* and *Hodes II* majorities today use that evidence-based approach to conclusively show the legislation at issue has no credible medical or evidentiary basis. *Stanek*, 318 Kan. at ___, slip op. at 33 ("[T]here simply is no evidence in the record from which to conclude the Challenged Laws provide any necessary benefit to the health and safety of women seeking abortions in Kansas."); *Hodes II*, 318 Kan. at ___, slip op. at 33. In that same vein, my *Hodes I* concurrence explained:

"Pregnant women, like the rest of us, have protected liberty interests fully rooted in our Kansas Constitution. No one can reasonably deny that. Yet the record so far indisputably shows S.B. 95 does more than significantly constrain a woman's access to abortion. It is a governmental edict denying pregnant women the safest and most routine medical procedure available for its purpose in the second trimester—a procedure elected by approximately 600 women in Kansas annually. And the justification for this prohibition is that the government professes to prefer less routine, more physically invasive medical options without offering actual evidence at the temporary injunction

hearing to support this preference. Those who think there is no role for our state Constitution when government flexes this kind of muscle should be very afraid about what comes next." *Hodes I*, 309 Kan. at 685-86.

Taking the dissent's snippets from my concurrence (underlined below in the quotations) in order, the first discusses "tossing around" strict scrutiny nomenclature and hoping "for the best." My *Hodes I* concurrence says:

> "The *Hellerstedt* model I suggest effectively secures the constitutional protections considered today in a manner commensurate with what is at stake. And for me, the articulation that follows is necessary because it avoids simply tossing around strict scrutiny nomenclature like 'compelling state interest' or 'narrowly tailored to further that compelling state interest' without giving those concepts contextual substance and then hoping for the best. 309 Kan. at 614, 663, 678, 680-82 (majority). Litigation such as this is factually intensive and often medically based so an abstract, textbook approach is counterproductive. This is where the majority decision leaves the district court in a lurch." (Emphasis added.) *Hodes I*, 309 Kan. at 688.

In context, this simply reiterates my central thesis that embraces an evidence-based model early in the litigation to show the district court how to correctly apply the facts to the law on remand.

Next, the dissent picks up this phrase about "unsettling ripple effects," from the following paragraph:

> "Pre-Casey federal strict scrutiny jurisprudence will also have potentially unsettling ripple effects in other areas of Kansas law touching on abortion access. See, e.g., K.S.A. 65-6709 (requiring informed consent). Compare *Casey*, 505 U.S. at 882 (plurality opinion) (holding informed consent provisions requiring 'truthful,

56

nonmisleading information about the nature of the procedure, the attendant health risks and those of childbirth, and the "probable gestational age" of the fetus' did not impose undue burden), with *Thornburgh v. American Coll. of Obst. & Gyn.*, 476 U.S. 747, 764, 106 S. Ct. 2169, 90 L. Ed. 2d 779 (1986) (holding informed consent provisions were facially unconstitutional for requiring patient to be informed of '"detrimental physical and psychological effects"' and '"particular medical risks"' of abortion, because it tended to 'increase the patient's anxiety, and intrude upon the physician's . . . professional judgment'). The majority signals this consequence when citing to McDonald, *A Hellerstedt Tale: There and Back Again*?, 85 U. Cin. L. Rev. 979, 1005-06 (2018), regarding scrutiny of governmental persuasion regulations. 309 Kan. at 669-70. I simply do not understand why the majority would stop short in explaining what its ruling today means." (Emphasis added.) *Hodes I*, 309 Kan. at 692.

As readily seen, the point is that the *Hodes I* majority had not yet developed how federal strict scrutiny jurisprudence might affect a right arising solely under the Kansas Constitution, which was something it should have done sooner rather than later.

Finally, we have this passage making the same point, from which the dissent extracts "vulnerable" and "subjective":

"But if the majority is really open to such claims being considered 'compelling' state interests, I fail to see how this remains a 'strict scrutiny' standard and not equally as <u>vulnerable</u> to 'leaving judges to <u>subjectively</u> gauge' what is a state interest as the majority complains now occurs with federal undue burden under *Casey*. 309 Kan. at 666. The majority decision is fraught with these mixed signals, which the trial court will need to decode before it can proceed." (Emphases added.) *Hodes I*, 309 Kan. at 693.

Despite the dissent's suggested aspersions, and its attempt to enlist my help in that effort, I concur fully in the majority's evidence-based analysis and result in both this appeal and *Hodes II*. My bottom line in these cases is the same as it always has been:

> "[W]e must apply what 'liberty' and 'inalienable natural rights' mean in the real world today for a pregnant woman. In doing so, that necessarily demonstrates meaningful limitations on the government's ability to elbow its way into the decisions she must make concerning her pregnancy." *Hodes I*, 309 Kan. at 706.

* * *

WILSON, J., concurring:  Today the majority concludes many regulations on abortion providers impermissibly burden the natural and fundamental right to determine whether to continue a pregnancy. To reach this conclusion, the majority identifies the nature of this right, and then finds the regulations fail under a strict scrutiny analysis. I concur with the majority's conclusion. I write separately to explain how I reached this outcome and to express concerns about the majority's reasoning.

In *Hodes & Nauser, MDs v. Schmidt,* 309 Kan. 610, 440 P.3d 461 (2019) (*Hodes I*), which is affirmed today in *Hodes & Nauser, MDs v. Kobach*, 318 Kan. ___ (*Hodes II*) (No. 124,130, this day decided), slip op. at 14, we held section 1 of the Kansas Constitution Bill of Rights is a judicially enforceable provision that recognizes rights broader than the rights guaranteed by the 14th Amendment to the United States Constitution. Section 1 provides:  "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." The text of this provision acknowledges *natural* rights, which are conceptually distinct from *fundamental* rights.

58

Natural rights are inherent and pre-political rights possessed by each person. See Black's Law Dictionary 1583 (11th ed. 2019) ("A right that is conceived as part of natural law and that is therefore thought to exist independently of rights created by government or society, such as the right to life, liberty, and property."). According to natural rights theorists, "rights and laws derive from the nature of the universe and exist independently of our knowledge of them. We discover what these rights are through correct reasoning." Wilkins, *Should Public Education Be a Federal Fundamental Right?* 2005 B.Y.U. Educ. & L.J. 261, 263 (2005). Natural rights protect "an ability to act in a particular area." Wilkins, 2005 B.Y.U. Educ. & L.J. at 264; Barnett, *Getting Normative: The Role of Natural Rights in Constitutional Adjudication*, 12 Const. Comment. 93, 108 (1995) ("The concept of natural rights . . . asks . . . what moral 'space' or 'jurisdiction' each person requires in order to pursue the good life in society with others.").

Natural rights are often distinguished from positive rights, which are rights that come from government. Gienapp, *The Foreign Founding: Rights, Fixity, and the Original Constitution,* 15 Tex. L. Rev. Online 115, 123 (2019) ("Founding-era Americans identified other fundamental rights beyond retained natural rights, as Campbell explains, namely positive rights that derived not from the state of nature but political society itself."); Hamburger, *Natural Rights, Natural Law, and American Constitutions*, 102 Yale L.J. 907, 908 (1993) ("By definition, therefore, natural rights did not conventionally include acquired rights—rights existing only under civil government."). Examples of positive rights include due process, habeas corpus, the right to a jury trial, and the right to vote. Campbell, *Republicanism and Natural Rights at the Founding,* 32 Const. Comment. 85, 92, 99 (2017); Croy & Lemke, *An Unnatural Reading: The Revisionist History of Abortion in* Hodes v. Schmidt, 32 U. Fla. J.L. & Pub. Pol'y 71, 72 (2021).

John Locke, an Enlightenment theorist referenced heavily in *Hodes I*, "believed that all men, in a state of nature, possessed certain inherent natural rights and retained those rights when they contracted to be governed." Parker, *The Pledge Protection Act and the Conflicting Fundamental Rights Limitation on the Article III Power to Control the Supreme Court's Appellate Jurisdiction*, 54 Loy. L. Rev. 467, 474 (2008); see also Campbell, *Republicanism and Natural Rights at the Founding,* 32 Const. Comment. at 87-90 (outlining the relationship between natural rights and social contract theory).

The creation of Kansas was such a contract to be governed and required the people to cede *some* natural rights to the government to maintain an orderly, collectively beneficial society. See *Wright v. Noell*, 16 Kan. 601, 603, 1876 WL 1081 (1876) ("By the constitution the people have granted certain powers, and to that extent have restricted and limited their own action."); Calabresi & Vickery, *On Liberty and the Fourteenth Amendment:  The Original Understanding of the Lockean Natural Rights Guarantees*, 93 Tex. L. Rev. 1299, 1317-18 (2015) ("Mason endorsed the Lockean ideal that all men retain some of their natural rights after subscribing to the social compact, in contrast to the idea put forth by Thomas Hobbes and Jean-Jacques Rousseau that men surrender all their natural rights to the sovereign in exchange for security and public order."); Barnett, *The Proper Scope of the Police Power*, 79 Notre Dame L. Rev. 429, 451 (2004) ("At the time of the Founding, almost no one claimed or believed that one surrenders all one's natural rights up to government, but only those that were necessary. One cannot infer, then, from the fact that some natural rights were surrendered up, that other rights still retained by the people can be denied or disparaged with impunity."); Mancil, *Reviving Elusive Rights:  State Constitutional Unenumerated Rights Clauses as Bounded Guarantors of Fundamental Liberties*, 19 Geo. J.L. Pub. Pol'y 281, 296 (2021) ("Lockean philosophy, which dominated colonial political thinking, inspired the construction of a

constitution based on separation of powers and the reservation to the people all rights the sovereign did not explicitly assume.").

But even so, section 1's language is clear the people retain other, non-ceded natural rights. And because section 1's "among which" language clarifies that the provision recognizes natural rights *beyond* life, liberty, and the pursuit of happiness, in *Hodes I* we faced the task of identifying an unenumerated natural right.

To interpret our Constitution, we first look to the constitutional text, and "[w]hen the words themselves do not make the drafters' intent clear, [we] look to the historical record, remembering '"the polestar . . . is the *intention* of the *makers* and *adopters*."'" *Hodes I,* 309 Kan. at 623 (quoting *Hunt v. Eddy*, 150 Kan. 1, 5, 90 P.2d 747 [1939]). Applying this test, we considered the debates and conversations that occurred at the Wyandotte Convention—the gathering that led to the creation of the Kansas Constitution, which was later ratified by voters in October 1859. *Hodes I,* 309 Kan. at 625, 627-28. Research revealed that section 1's language came from the Declaration of Independence. Thomas Jefferson, the author of the Declaration, based the language on the Virginia Declaration of Rights of 1776, which was written by James Madison. 309 Kan. at 639. Both Madison and Jefferson were familiar with the intellectual landscape of the time, including the writings of William Blackstone, Sir Edward Coke, and John Locke. These legal and philosophical thinkers were considered, as well as cases from our court and others, to determine the meaning of section 1. 309 Kan. at 639-44.

The *Hodes I* majority first concluded section 1 guarantees a natural right to personal autonomy, and explained "[f]ew decisions impact our lives more than those about issues that affect one's physical health, family formation, and family life." *Hodes I*, 309 Kan. at 645. Section 1 guarantees that both men and women have these rights, and

61

therefore "[d]enying a pregnant woman the ability to determine whether to continue a pregnancy would severely limit her right of personal autonomy." 309 Kan. at 646. The court rejected the argument that early Kansas laws criminalizing abortion undermined this conclusion. 309 Kan. at 650-60.

In summary:

"[Numerous] factors lead us to conclude that section 1's declaration of natural rights, which specifically includes the rights to liberty and the pursuit of happiness, protects the core right of personal autonomy—which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows Kansans to make their own decisions regarding their bodies, their health, their family formation, and their family life. Pregnant women, like men, possess these rights." *Hodes I*, 309 Kan. at 660.

Next, the majority considered how to evaluate an infringement of this right, and explained the natural right to personal autonomy was *fundamental.* See *Hodes I*, 309 Kan. at 661-71. Though natural rights and fundamental rights share a family resemblance, contemporary United States Supreme Court precedent disentangles these concepts. Cf. Parker, *The Pledge Protection Act and the Conflicting Fundamental Rights Limitation on the Article III Power to Control the Supreme Court's Appellate Jurisdiction*, 54 Loy. L. Rev. 467, 474 ("This contemporary understanding of fundamental rights stems from the concept of natural rights, which guided the formation of the federal republic."); Broyles, *Doubting Thomas:  Justice Clarence Thomas's Effort to Resurrect the Privileges or Immunities Clause*, 46 Ind. L. Rev. 341, 359 (2013) ("The deep misgivings concerning natural rights has led to a Supreme Court that, for decades, has ignored or denied the relevance of natural rights as a legitimate source for understanding fundamental rights.").

In *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 237, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022), the Court explained that an unenumerated right in the United States Constitution is fundamental if it is "'deeply rooted in [our] history and tradition'" and "it is essential to our Nation's 'scheme of ordered liberty.'" To make this determination, the Court conducts "a careful analysis of the history of the right at issue." 597 U.S. at 238. If a right is fundamental, then government infringement on that right must pass strict scrutiny analysis, where the government prevails if it "can show '"a subordinating interest which is compelling'" and that the infringement . . . is 'narrowly tailored to serve' that interest." *State v. Ryce*, 303 Kan. 899, 957, 368 P.3d 342 (2016) (quoting *N.A.A.C.P. v. Button*, 371 U.S. 415, 438-39, 83 S. Ct. 328, 9 L. Ed. 2d 405 [1963]). See Wilkins, 2005 B.Y.U. Educ. & L.J. at 265 ("The reason we care whether a right, natural or positive in nature, is also a 'fundamental' right is because a 'fundamental' right is afforded great Constitutional protection under the Fourteenth Amendment Due Process and Equal Protection Clauses.").

Though in *Hodes I* we were not interpreting the United States Constitution and were not bound by Court precedent when considering the parameters of section 1, the majority concluded strict scrutiny was the appropriate test to evaluate government infringement on the right to personal autonomy, which includes the right to decide whether to continue a pregnancy. *Hodes I,* 309 Kan. at 662-71; see also Levy, *Constitutional Rights in Kansas after* Hodes & Nauser, 68 U. Kan. L. Rev. 743, 762-63 (2020) (outlining the various reasons we found strict scrutiny appropriate).

I explain these details to illustrate the complexity of the issues here, underlying today's decision about abortion regulations in Kansas. The majority's template for *how* to evaluate the regulations is rooted in the various holdings of *Hodes I. Hodes & Nauser, MDs v. Stanek*, 318 Kan. at ___ (*Stanek*), slip op. at 15 ("Today . . . we reaffirmed the

strict scrutiny constitutional framework used in *Hodes I* set forth above. Thus, we apply it here to determine the constitutionality of the Challenged Laws."). Accordingly, my first consideration here must be whether the *Hodes I* majority was correct.

Based on my review, I agree that section 1 of the Kansas Constitution Bill of Rights is a judicially enforceable provision from which rights emanate that are broader than the rights contained within the 14th Amendment to the United States Constitution. But still, unlike the majority, I confront three more questions pertinent to the specific issue before us of whether the Challenged Laws are unconstitutional: (1) whether the text of section 1 recognizes a *natural right* to personal autonomy; (2) if so, whether that natural right includes the right to decide whether to continue a pregnancy; and (3) if so, whether *either* of those rights is also *fundamental* and therefore strict scrutiny analysis must be applied to any government action burdening the right.

In my view, the answers to these questions are far from clear. See Hamburger, *Natural Rights, Natural Law, and American Constitutions*, 102 Yale L.J. 907, 907 (1993) ("Natural rights and natural law are ideas that frequently seem to have something in common with the elusive shapes of a Rorschach test. They are suggestive of well-defined, recognizable images, yet they are so indeterminate that they permit us to see in them what we are inclined to see."). Particularly compelling are two lines of criticism directed at the holdings of the *Hodes I* majority.

First, early territorial and state law criminalized abortion. See *Hodes & Nauser, MDs v. Schmidt,* 52 Kan. App. 2d 274, 340, 368 P.3d 667 (2016) (Malone, C.J., dissenting), *aff'd* 309 Kan. 610 (2019). As noted above, our standard of review requires us to ascertain the intent of the framers when evaluating our constitutional text. I find it likely these laws would have informed the Wyandotte delegates' views on the rights

contained in section 1. I question whether the methodology of moving beyond the intent of the delegates to legal and philosophical texts appropriately applied our governing standard. See Levy, *Constitutional Rights in Kansas After* Hodes & Nauser, 68 U. Kan. L. Rev. 743, 774 ("In light of the court's analysis, the recognition of such rights would not depend on the specific understanding of the framers and ratifiers of the Kansas Constitution, but rather upon a broader analysis of the philosophical, historical, and jurisprudential foundations of the right."). And I am skeptical the delegates had Locke, Blackstone, and Coke in mind as they debated the language of the provision that ultimately became section 1. *Hodes I*, 309 Kan. at 628. More likely, their understanding of natural rights was shaped by the legal and social landscape of Kansas at the time. As such, when considering the framer's *intent*, I am not certain the *Hodes I* majority accurately divined the scope of section 1.

Second, even assuming the *Hodes I* majority used the proper methodology, commentators have suggested the majority's reading of these authors was incomplete and erroneous. There is evidence the authors the majority relied on viewed abortion as wrong, which undermines the majority's conclusion that the right to decide whether to continue a pregnancy is included within the natural and fundamental right to personal autonomy. Croy & Lemke, *An Unnatural Reading:  The Revisionist History of Abortion in* Hodes v. Schmidt, 32 U. Fla. J.L. & Pub. Pol'y at 82-91 (arguing the *Hodes I* majority erroneously concluded Locke, Coke, and Blackstone supported its understanding that the natural right to bodily autonomy included the right to have an abortion, and also arguing the *Hodes I* majority omitted other key sources).

Having weighed these concerns against the reasoning of the *Hodes I* majority, it is likely I would have dissented in *Hodes I*. But I do not address these questions as a matter of first impression. I confront these issues with *Hodes I* already decided. Consequently,

the related doctrines of stare decisis and law-of-the-case must be weighed as part of my analysis here. Those doctrines ultimately govern my decision.

"The doctrine of stare decisis provides that 'points of law established by a court are generally followed by the same court and courts of lower rank in later cases in which the same legal issue is raised.'" *State v. Clark*, 313 Kan. 556, 565, 486 P.3d 591 (2021). The doctrine "'ensures stability and continuity—demonstrating a continuing legitimacy of judicial review. Judicial adherence to constitutional precedent ensures that all branches of government, including the judicial branch, are bound by law.'" *State v. Sherman*, 305 Kan. 88, 108, 378 P.3d 1060 (2016) (quoting *Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 715, 89 P.3d 573 [2004]). Though not a "'rigid inevitability,'" stare decisis is a "'prudent governor on the pace of legal change.'" *State v. Davidson*, 314 Kan. 88, 93, 495 P.3d 9 (2021) (quoting *State v. Jordan*, 303 Kan. 1017, 1021, 370 P.3d 417 [2016]). We are compelled to follow precedent unless we are "''clearly convinced [that the rule] was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent.'''" *Davidson*, 314 Kan. at 93 (quoting *Sherman*, 305 Kan. at 108).

Under the law-of-the-case doctrine, "'once issues are decided by the court, those issues should not be relitigated or reconsidered unless they are clearly erroneous or unless some manifest injustice has been imposed.'" *State v. Collier*, 263 Kan. 629, 633, 952 P.2d 1326 (1998) (quoting *Renfro v. City of Emporia, Kan.*, 732 F. Supp. 1116, 1117 [D. Kan. 1990], *aff'd* 948 F.2d 1529 [1991]). Like stare decisis, the law-of-the-case doctrine supports stability by emphasizing finality and preventing infinite relitigation. *Collier*, 263 Kan. at 631.

Regardless of whether I would have joined the majority when *Hodes I* was first decided, I cannot say I am clearly convinced the decision was entirely wrong, or that the core holdings of *Hodes I* are no longer sound because of changing conditions and more good than harm will come by overruling our section 1 jurisprudence. In fact, I believe the opposite to be true.

Aside from interpreting the law, a judge's primary obligation is to protect the rule of law. One aspect of this is maintaining the stability and predictability of our legal system. Kansans deserve to know that laws, both those that touch the intimate aspects of our lives and those that do not, will not simply be cast aside when new personalities join this court. To do so would undermine the public's confidence in this court, and reasonably lead to the conclusion that the appointment of court members is simply an exercise of political gamesmanship. This court must be understood "as an institution, rather than a collection of individuals," and this understanding informs my decision to recognize the core holdings of *Hodes I* as binding on my decision today. See *State v. Davidson*, 314 Kan. 88, 95, 495 P.3d 9 (2021) (Standridge, J., concurring) ("[A] change in the membership of this court cannot, in and of itself, justify a departure from the basic principle of stare decisis."); see also *Cromwell v Simons,* 280 F. 663, 674, *cert. denied* 258 U.S. 630 (2d Cir. 1922) (observing that a personnel change on the court, "although it changed the minority view of the former hearing into the majority view at this hearing, does not in itself warrant the court in disregarding 'the law of the case' as it was determined by the court when the case was here before").

But that's not all. Another equally important consideration in why stare decisis and the law-of-the case compel my conclusion is that Kansans, through their elected officials and in person, have *acted* in response to *Hodes I.* Perhaps most notably, Kansans spoke on the topic in August 2022, when nearly 60 percent of Kansas voters rejected the "Value

Them Both" constitutional amendment. This vote did not dispute the majority's position in *Hodes I* and can be interpreted to approve it. And we have explained "[t]he doctrine of stare decisis is particularly compelling in cases where . . . the legislature is free to alter a statute in response to court precedent with which it disagrees but declines to do so." *State v. Quested*, 302 Kan. 262, 278, 352 P.3d 553 (2015). Similar logic applies profoundly to a rejected constitutional amendment.

Consider everything that has happened, relating directly to the background and consequence of *Hodes I*. These occurrences demonstrate the design and strength of our structure of government, with three equal and independent branches—legislative, executive, and judicial—each having checks and balances against the power of the others to ensure that no branch will ever have total control over the laws in our country and our state. A bill limiting a particular abortion procedure was passed (legislative branch). The bill was not vetoed (executive branch). The bill became law. A lawsuit was filed by persons affected by the law, asking the judicial branch to declare the law unconstitutional and therefore void. The law was interpreted to impede a natural and fundamental right (judicial branch). That interpretation of the law was challenged by a constitutional amendment proposal passed by a two-thirds majority of the Legislature. That proposed amendment to our state Constitution was taken directly to the only entity having the power to override all three branches—the people themselves—to determine whether the people's Constitution, as interpreted, should be changed. The people spoke with their votes. Since the proposed amendment failed, our state Constitution was not changed; the judicial interpretations of the "old" Constitution remained valid. Though some were grievously disappointed, the *process* envisioned by Jefferson, Madison, and the rest of our founders *worked*. The results were accepted by the people, and Kansas showed the world how things are done in a successful democracy.

To entirely upturn our section 1 jurisprudence in this context would be unacceptably disruptive and signal that the stability of our legal system is ultimately based on the whims of individual members of this court. To me, these considerations are more significant than my personal view on the accuracy of *Hodes I.* The issues are too complex for me to suggest in good faith that the decision was *clearly* erroneous. And the risk of tarnishing the legitimacy of this court, as well as my concerns about undermining the stability of our legal system, lead me to believe that voting against the constitutional framework applied today would do more harm than good. Accordingly, I conclude I am bound by *Hodes I* and that today's majority reached the correct result.

However, I pause to explain that, based on the majority opinion in this case and *Hodes II*, I am not sure that *all* of *Hodes I* remains good law. As such, I believe it is necessary to clarify the *Hodes I* core holdings I am compelled to follow.

As described above, *Hodes I* concluded personal autonomy was a natural *and* fundamental right. And since the right to continue a pregnancy was included in personal autonomy, that right was also natural *and* fundamental. Today's *Hodes II* majority, which is comprised of the same four justices as *Stanek'*s majority, reiterates: "We stand by our conclusion that section 1 of the Kansas Constitution Bill of Rights protects a fundamental right to personal autonomy, which includes a pregnant person's right to terminate a pregnancy. The State must show any infringement of that right withstands strict scrutiny." *Hodes II*, 318 Kan. at ___, slip op. at 14.

In both *Hodes II* and *Stanek,* the majorities do not disturb the *Hodes I* core holdings that (1) personal autonomy is a natural right; (2) the right to decide whether to continue a pregnancy is included in the natural right of personal autonomy; and (3) the

69

natural right to determine whether to continue a pregnancy is fundamental. *Hodes II*, 318 Kan. at \_\_\_, slip op. at 14; *Stanek*, 318 Kan. at \_\_\_, slip op. at 8, 15.

But today's majority in *Stanek* may be retreating from the holding that personal autonomy is fundamental. See *Hodes I*, 309 Kan. 610, Syl. ¶ 15 ("The natural right of personal autonomy is fundamental and thus requires applying strict scrutiny."). Several examples illustrate this point, some of which omit this holding and others that may describe it differently. First, Syllabus paragraph four provides:

> "Section 1 of the Kansas Constitution Bill of Rights protects an inalienable natural right of personal autonomy, which includes the right to abortion. The unique and profound attributes of the decision to have an abortion are integral to a woman's inalienable natural right of personal autonomy under section 1; thus, laws that infringe on the right to abortion are subject to strict scrutiny." *Stanek*, 318 Kan. \_\_\_, Syl. ¶ 4.

The majority reiterates this point in the opinion's body:

> "In 2019, this court decided *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 440 P.3d 461 (2019) (*Hodes I*). There, we held section 1 of the Kansas Constitution Bill of Rights protects an inalienable natural right to personal autonomy, which includes the right to abortion. 309 Kan. at 614. And we held laws that infringe on the right to abortion are subject to strict scrutiny." *Stanek*, 318 Kan. at \_\_\_, slip op. at 8.

But later in this opinion, the majority says something else. It describes the relationship between personal autonomy as a *natural right* and personal autonomy as a *fundamental right* in three ways. First, the majority notes the *Hodes I* "court equated its holding that personal autonomy is a natural inalienable right to one that personal autonomy is a fundamental right." *Stanek*, 318 Kan. at \_\_\_, slip op. at 17. Second, in a

parenthetical, the majority cites *Hodes I* and explains the majority "call[ed]" personal autonomy fundamental. *Stanek*, 318 Kan. at ___, slip op. at 17. Third, the majority describes the *Hodes I* court as "dictat[ing] that the right to abortion is subject to strict scrutiny because it is an exercise of the inalienable natural right of personal autonomy protected by section 1 of the Kansas Constitution Bill of Rights, which is a fundamental right." *Stanek*, 318 Kan. at ___, slip op. at 17. These statements may serve to subtly recast the holdings in *Hodes I* and *Hodes II* into a more palatable form—a form unburdened by the consequences today outlined in Justice Stegall's perceptive and powerful dissent.

I can only imagine the confusion that will occur amongst lower courts and practitioners attempting to square today's two opinions. I share this confusion and believe it is possible that, following the publication of these opinions, the *Hodes I* holding that personal autonomy is a fundamental right has been changed. *Stanek*, 318 Kan. at ___, slip op. at 94-99 (Stegall, J., dissenting). Minimally, the precedential value of this holding is attenuated, and I am not certain when or how it binds me or any lower court.

But if this court is going to change a holding of the case that announced the constitutional framework of section 1 of the Kansas Constitution Bill of Rights, then the court should explicitly say so. There is nothing wrong with circumscribing the limits of a previous opinion. But there is something wrong with doing so through a "sleight of judicial hand." *Stanek*, 318 Kan. at ___, slip op. at 89 (Stegall, J., dissenting). In effect, Kansans now have two opinions, released on the same day, and joined by the same majority, which may interpret their rights differently. That's a problem.

In his concurrence, Justice Rosen's criticism of my concerns only deepens my concerns. He now provides *another*, slightly different, way of identifying a section 1 fundamental right, as if the "label" as natural or fundamental doesn't matter, and even

71

seems to speak for a majority whose justices do not join in his conclusory declarations on their behalf. He then cavalierly says he trusts the lower courts to follow the path in *Hodes I*, despite its subtle difference from the analytical paths set forth in *Hodes II and Stanek*. I trust they will try.

Not only that, but the majority and Justice Rosen rely on the newly announced "profound and unique attributes" test to limit the scope of the natural right of personal autonomy. *Stanek*, 318 Kan. at ___, slip op. at 15; 318 Kan. at __, slip op. at 53 (Rosen, J., concurring). Again, this appears to be an attempt to sidestep the consequences of Justice Stegall's dissent. Justice Stegall is likely correct that this court's pronouncement in *Hodes I* and *Hodes II* that personal autonomy is a fundamental right will lead to increased litigation to determine this right's parameters. Other commentators have made similar points. Croy & Lemke, *An Unnatural Reading: The Revisionist History of Abortion in* Hodes v. Schmidt, 32 U. Fla. J.L. & Pub. Pol'y at 80 (arguing *Hodes I* "contain[s] no limiting principle"); Levy, *Constitutional Rights in Kansas after* Hodes & Nauser, 68 U. Kan. L. Rev. at 775-76 ("Using a broader conceptual approach to natural rights under section 1, the Kansas courts might be more inclined to treat the right to die as within the scope of personal autonomy and the right to make decisions concerning one's physical health.").

If today's majority is not changing the holding that personal autonomy is fundamental, then another way to avoid far-reaching consequences is to limit how the court defines the natural right to personal autonomy, and thereby clarify the type of personal autonomy that falls under section 1's protective umbrella. By announcing this new test, which in my view has no support in the text of *Hodes I*, the majority seeks to rein in the opinion's scope, narrow the natural right to personal autonomy, and hopefully alleviate Justice Stegall's concern about the "target-rich environment" where any

72

government burden on a right that sounds in personal autonomy would be subject to strict scrutiny. *Stanek*, 318 Kan. at ___, slip op. at 88 (Stegall, J., dissenting).

I take no position on the wisdom or accuracy of this new test because this extrapolation into the identity of the fundamental right at issue is unnecessary for today's holding. But I pause to briefly note that the "profound and unique attributes" test will likely provide little guidance to district courts when Kansans ask them to determine whether an asserted right falls under the natural right of personal autonomy, and thus requires the application of strict scrutiny. A district court will be forced to rely on analogical reasoning that compares the only right at issue in this case—the right to decide whether to continue a pregnancy—to some asserted right in the future. In the past we have criticized district courts for implementing their own factor tests. See *Rivera v. Schwab*, 315 Kan. 877, 907, 512 P.3d 168 (2022) (criticizing the district court for "crafting its own set of 'five non-exclusive factors'" that were "unmoored from precedent"). I fear this new test, without further articulation, requires district courts to do just that.

The majorities in *Hodes I, Hodes II*, and *Stanek* seem to each identify the single right at issue a little differently. And all the confusion created by this imprecision is unnecessary to resolve the issues before us today. Our job is to identify as clearly as possible the nature of the asserted right and the test to be applied. That's what the court did in *Hodes I* and the right asserted here is the same.

Though I am troubled by these developments in our section 1 jurisprudence, I do not depart from the majority's judgment. First, the doctrines of stare decisis and law-of-the-case compel me to apply the constitutional framework for section 1 natural rights claims set forth in *Hodes I*. This framework requires Kansas courts to consider (1)

73

whether the right asserted is a natural right in section 1; and (2) which test should apply to government burdens on the asserted right.

Second, these doctrines require the application of this framework to the specific right in question today: the right to determine whether to continue a pregnancy. *Hodes II* and *Stanek* do not disturb the *Hodes I* core holdings that personal autonomy is a natural right under section 1, and that the right to decide whether to continue a pregnancy is *included* in the natural right to personal autonomy. Further, today's opinions reaffirm that the right to decide whether to continue a pregnancy is also fundamental.

Based on these holdings, I agree with the majority's conclusion because the relevant constitutional framework and application of the narrow right asserted *here* to that constitutional framework have already been decided. So, like today's majority, I must apply strict scrutiny to the governmental regulations that are challenged.

I take no issue with the majority's strict scrutiny analysis, which is clarified and improved here with a better test than the one set forth in *Hodes I*, to ascertain whether any infringement on an identified fundamental right at issue passes strict scrutiny muster. This tightened test addresses the concerns in Justice Biles' concurrence in *Hodes I* and will certainly assist trial courts when making necessary findings of fact and conclusions of law. *Stanek*, 318 Kan. at ___, slip op. at 55 (Biles, J., concurring).

In the end, though I probably would not have voted with the *Hodes I* majority in the first instance, and though I am concerned about how today's opinions potentially rework portions of *Hodes I*, I am duty bound to follow the clear and essential path illuminated by our precedent. This is necessary to protect the stability, predictability, and trust in our legal system. My decision to do so is further buttressed by the people's vote

74

on this very matter, which can be interpreted as a repudiation of legislative attempts to eliminate the core holdings of *Hodes I*—holdings which survive today's confusing and troubling revisions.

I concur in the judgment of the majority.

\* \* \*

STEGALL, J., dissenting:  The saga of this court's section 1 jurisprudence has now taken its bizarre—but predicted—turn. Recall I wrote at the conclusion of my lengthy dissent in *Hodes I* that a legal regime of unrestricted access to abortion is now "the judicially preferred policy tail wagging the structure of government dog" and, as such, every rule and even judicial coherence and consistency will "give way, at every turn, to the favored policy." *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 778, 440 P.3d 461 (2019) (*Hodes I*) (Stegall, J., dissenting). Should proof of this claim be required, one need look no further than the pudding of today's decision. Now, even the holding of *Hodes I* has fallen victim to the machinations of a court dead-set on arbitrary policy-making designed to enshrine *only* court-preferred rights in section 1's guarantees. The betrayal of this court's promise of neutral, uniform, and rational constitutional adjudication is as far-reaching as it is audacious—and its damaging impact on this institution's legitimacy will be felt for years to come.

I recognize the gravity of this language, and the besetting temptation to exaggerate the rhetoric of disagreement. Avoiding that temptation requires disciplining oneself to a process of rigorous, precise, and compelling argument—all the more so when disagreements are sharp. That is what this dissent will now provide. The story is a complex one, requiring a step-by-step accounting of (1) how we got here; (2) the

75

regulatory impact of today's holding; (3) what this court actually held in *Hodes I*; (4) how today's decision breaks faith with the promise of *Hodes I*; and (5) what is left in the aftermath. In the end, the conclusion no judge wants to reach is unavoidable—we are not, here, functioning as a court and we are not writing constitutional law.

### *How We Got Here—Regulating Abortion Like All Other Medical Procedures*

This case was effectively decided five years ago when we found a fundamental right to personal autonomy in section 1 of the Kansas Constitution Bill of Rights. See *Hodes I*, 309 Kan. 610, Syl. ¶ 15. In the meantime, a great deal of political ink has been spilled pretending otherwise. Consider the successful 2022 campaign against the "Value Them Both" constitutional amendment intended to overturn *Hodes I*. The *Hodes II* majority and Justice Wilson's concurring opinion here even cite the margin of victory to buttress their conclusions. *Hodes & Nauser, MDs v. Kobach*, 318 Kan. ___ (*Hodes II*) (No. 124,130, this day decided), slip op. at 10; *Hodes & Nauser, MDs v. Stanek*, 318 Kan. ___ (*Stanek*), slip op. at 67-68 (Wilson, J., concurring). During the political campaign, however, Kansas was awash with claims that voting "no" on the amendment simply secured a moderate, common-sense, middle-ground status quo on the most divisive social and moral issue of our day.

Ashley All, spokesperson for Kansans for Constitutional Freedom (the principal campaign arm of the "Vote No" effort) told PBS that if the amendment failed, women would be "in the same situation they're in right now. I mean, we have access to abortion care, but we also have restrictions and reasonable regulations." She went on to claim that she had no expectation that abortion rights would be expanded by *legislation* because "[t]his is about protecting the access we have." Rogin, *Kansas Becomes First State to Hold a Vote on Abortion Rights After* Roe *Reversal*, PBS (Aug. 1, 2022). In the same

vein, those in the Vote No coalition told Kansans that a no vote "protects 19 laws that heavily restrict and regulate abortion." Alatidd & Bahl, *Getting Texts on Kansas Abortion Constitution Amendment? Here's What a 'Yes' and 'No' Vote Means*, Topeka Capital-Journal (Aug. 1, 2022).

The news media repeated these claims in story after story. A news article in the Kansas Reflector refuted suggestions made by Value Them Both proponents that the amendment was needed to protect common-sense regulations by saying a no vote "maintains the status quo, in which abortion is legal and regulated" and quoting Kansans for Constitutional Freedom as saying "[w]e all agree that abortion should be regulated like all other medical procedures." Kite, *Anti-Abortion Groups Make Dubious Claims as Kansas Amendment Vote Nears*, Kansas Reflector (July 19, 2022); see also Conlon, *FAQ: Getting the Facts Right on the Kansas Abortion Vote*, KMUW (July 22, 2022) (asking the question, "If the amendment fails, would existing abortion restrictions disappear?" and answering, "Likely not . . . .").

But the game is now up. As savvy campaigners knew from the get-go, legislation would not be needed because no regulation of abortion—none—will be permitted by this court under the far-reaching legal regime we announced in *Hodes I*. Dissenting from that decision, I explained at length the nature of the majority's folly. In short, this court has "abandon[ed] the original public meaning of section 1 of the Kansas Constitution Bill of Rights and paint[ed] the interest in unborn life championed by millions of Kansans as rooted in an ugly prejudice." *Hodes I*, 309 Kan. at 707 (Stegall, J., dissenting).

*Eviscerating the Regulatory State*

I will not rehash the historical and legal dismantling of the majority's imagined section 1, which I set forth fully in *Hodes I* and which remains unrefuted. Instead, I must now turn to examine the implications of the majority's constitutional revolution on the entire regulatory edifice of Kansas law. To begin, let's achieve some clarity about the specific laws governing abortion providers being struck down in the name of protecting a fundamental right to personal autonomy. They are:

- Kansas Department of Health and Environment (KDHE) must inspect abortion facilities once a year without notice. K.S.A. 65-4a05.
- After 22 weeks, abortions must be performed in a hospital or ambulatory surgical center. K.S.A. 65-4a07.
- Admitting privileges at a nearby hospital are required in order to perform an abortion. K.S.A. 65-4a08.
- In order to perform an abortion in Kansas, the physician must be licensed in Kansas and must examine the patient in person. K.S.A. 65-4a10.
- Only a doctor or other health professional can administer drugs and medications to patients. K.A.R. 28-34-135(m).
- A physician and at least one health professional must be available to each patient throughout the abortion. K.A.R. 28-34-138(c).
- Health professionals must monitor each patient's vital signs throughout the abortion procedure. K.A.R. 28-34-138(f).
- Facilities must have written policies implemented for post-procedure care of patients who are administered local anesthesia. K.A.R. 28-34-139(a).

- There must be a "station with visual observation of each patient in the recovery area." K.A.R. 28-34-133(b)(7)(A).
- If the facility has a stock of controlled drugs, the facility must be registered with the Kansas Board of Pharmacy. K.A.R. 28-34-135(n).
- Airway and fluid management equipment and supplies must be available in the facility, as well as other supplies such as blood pressure cuffs. K.A.R. 28-34-135(c), (e).
- All facilities must comply with local codes and ordinances, provide documentation of a plan to dispose of biomedical waste and human tissue, and be within 30 miles of an accredited hospital. K.A.R. 28-34-127(c).

The majority finds these regulations infringe upon the right to an abortion. In the language of our decision in *Hodes I*, the government has encroached upon the "natural right of personal autonomy" protected by section 1, which "is fundamental and thus requires applying strict scrutiny." *Hodes I*, 309 Kan. 610, Syl. ¶ 15. Specifically, the majority notes that "once a plaintiff proves an actual infringement—*regardless of degree* and *even if the infringement is slight*—the government's action is presumed unconstitutional and the burden shifts to the government to establish the requisite compelling interest and narrow tailoring of the law to serve it." *Stanek*, 318 Kan. at ___, slip op. at 19. A legal standard one member of the majority recently firmly rebuffed. See *Hodes I*, 309 Kan. at 688, 692-93 (Biles, J., concurring) (arguing that the *Hodes I* majority "simply toss[ed] around strict scrutiny nomenclature . . . and then hop[ed] for the best" and concluding that the majority's "strict scrutiny jurisprudence will also have potentially unsettling ripple effects in other areas of Kansas law" because the standard is so "vulnerable" to judges' "subjective[]" opinions).

79

An aside: Justice Biles takes umbrage at having his own words recalled in this dissent, suggesting I have "misappropriat[ed]" them. *Stanek*, 318 Kan. at ___, slip op. at 54 (Biles, J., concurring). Of course, clever allusions to Mary Shelley's horror fiction aside, I have done no such thing. Justice Biles was right in the first instance to call into question the majority's slip-shod application of strict scrutiny in *Hodes I*, a fact made apparent by the legal mess that is today's opinion. Perhaps an earlier account of Dr. Frankenstein is more apropos—for in true Promethean form Justice Biles "offer[s] . . . a boon and then withhold[s] it." *Prometheus Bound*, Classical Tragedy, Greek and Roman: 8 Plays in Authoritative Modern Translations, p. 163 (Willoughby ed. 1990). But Justice Biles insists he has changed his mind simply because the majority has adopted his "evidence based" approach. Here he blurs the crucial distinction between law and facts. Indeed, I agree with him that (especially in *Hodes II*) the State has badly bungled its case by failing (or refusing) to marshal even a timid evidentiary basis for its claims when it had the full opportunity to do so below. As unfortunate as that may be (and is) for the fate of the State's case, it really tells us nothing about the merits of the majority's chosen jurisprudential path. Justice Biles' initial skepticism toward the law announced in *Hodes I* scores what amounts to a knock-out blow against the "evidence based" Justice Biles of today. Now back to the point at hand.

So today, applying this standard, the majority concludes the challenged regulations "increase the costs," "cause delays," and "impose financial burdens." *Stanek*, 318 Kan. at ___, slip op. at 21. Here the majority has stumbled upon a core truth discovered by the founders of the Austrian School of Economics long ago. Government regulation of a good or service in a market economy—what they called "restrictive measures"—will always have the effect of "diminishing productivity, and thus impairing supply." Mises, Interventionism: An Economic Analysis, p. 29 (1940). That is, the good or service being

80

regulated will become more expensive and less readily available. So yes, government regulation *always* "infringes" upon access to whatever good or service is being regulated.

To sum up this case in ordinary language, the state is telling abortion providers, if you want to do abortions in Kansas, you have to be licensed in Kansas, you have to be present in Kansas, you have to comply with local building codes, you have to be close to a hospital and be able to admit a patient at that hospital in case something goes wrong, you have to watch your patient's vital signs during an abortion, you have to have policies and a building designed to ensure post-procedure care, you have to have the basic medical equipment, and if you want to have controlled substances, you have to tell the Board of Pharmacy. And this court is saying, not so fast, these requirements will make abortions more expensive and less readily available, so they must survive a strict scrutiny analysis.

But wait—one may ask—aren't these essentially the same kinds of things the state requires of all health care providers in Kansas? The answer is, without a doubt, yes. To demonstrate, let's interlace the same list of regulations being struck down today with just a few of the vast variety of mirroring provisions (set forth in italics type) regulating—in the words of Kansans for Constitutional Freedom—"all other medical procedures."

- KDHE must inspect abortion facilities once a year without notice. K.S.A. 65-4a05.
  - *KDHE must inspect each medical facility project approved by the federal "secretary of health, education, and welfare." K.S.A. 65-422.*
  - *Inspections must be made of hospitals and other medical facilities. K.S.A. 65-433.*

81

- o *Inspections must be allowed any time during business hours any place in the state of Kansas "where drugs are manufactured, packed, packaged, made, sold, offered for sale or kept for sale." K.S.A. 65-1629.*

- After 22 weeks, abortions must be performed in a hospital or ambulatory surgical center. K.S.A. 65-4a07.
  - o *Any surgical treatment of the ankle by a podiatrist can only be performed in a medical care facility. K.S.A. 2022 Supp. 65-2002(d).*

- Admitting privileges at a nearby hospital are required in order to perform an abortion. K.S.A. 65-4a08(b).
  - o *Admitting privileges at a local hospital are required in order to perform surgery at an ambulatory surgical center. Moreover, the ambulatory surgical center must have a written transfer agreement in place with a local hospital. K.A.R. 28-34-52b(g).*

- In order to perform an abortion in Kansas, the physician must be licensed in Kansas and must examine the patient in person. K.S.A. 65-4a10(a).
  - o *Anesthesia can only be provided by an individual that is licensed to administer anesthesia, and before undergoing anesthesia, each patient must have a physical examination. K.A.R. 28-34-56a(d), (h); K.A.R. 28-34-17a(c), (d)(2)-(3).*
  - o *In order to perform surgery in an ambulatory surgical center in Kansas, the physician must first have been granted privileges by the governing authority of the center to perform surgical procedures. K.A.R. 28-34-54(e).*

- Only a doctor or other health professional can administer drugs and medications to patients. K.A.R. 28-34-135(m).
    - *Medication or treatment can only be administered upon the "written and signed orders of a practitioner who is acting within the scope of that practitioner's license and who is qualified according to medical staff bylaws." K.A.R. 28-34-6a(g)(1).*
    - *Only a licensed health professional can administer anesthesia. K.A.R. 28-34-17a(c).*
    - *Only a physician or a registered nurse can administer blood and blood products in ambulatory surgical centers. K.A.R. 28-34-52b(e).*

- A physician and at least one health professional must be available to each patient throughout the abortion. K.A.R. 28-34-138(c).
    - *A physician must be available at all times that a patient is receiving or recovering from local, general, or intravenous sedation at an ambulatory surgical center. K.A.R. 28-34-54(g).*
    - *An anesthesiologist or physician must be available and readily accessible while anesthetics of any kind are being administered in an ambulatory surgical center, as well as during the post-anesthesia recovery period until all patients are alert or medically discharged from the post-anesthesia area. K.A.R. 28-34-56a(b)(1).*
    - *A registered nurse must be on duty at all times whenever a patient is in the ambulatory surgical center. K.A.R. 28-34-55a(c).*

- Health professionals must monitor each patient's vital signs throughout the abortion procedure. K.A.R. 28-34-138(f).

- o *Health professionals must observe any patient post-anesthesia for as long as necessary to be secure in the patient's condition. K.A.R. 28-34-17a(d)(4).*
- o *Qualified anesthesia personnel shall be present in the room through the administration of all anesthetics and must "continuously evaluate the patient's oxygenation, ventilation, circulation, and temperature." K.A.R. 28-34-56a(b)(1).*

- Facilities must have written policies implemented for post-procedure care of patients who are administered local anesthesia. K.A.R. 28-34-139(a).
  - o *Medical staff must have written policies governing surgical services, including requirements for what circumstances require the presence of what type of medical personnel. K.A.R. 28-34-17b(d).*
  - o *"Each patient's status shall be evaluated during anesthesia administration and shall be evaluated by a physician for proper anesthesia recovery before discharge." K.A.R. 28-34-52b(f).*

- There must be a "station with visual observation of each patient in the recovery area." K.A.R. 28-34-133(b)(7)(A).
  - o *One registered nurse must be on duty in the recovery room when the room is occupied. K.A.R. 28-34-17b(3).*

- If the facility has a stock of controlled drugs, the facility must be registered with the Kansas Board of Pharmacy. K.A.R. 28-34-135(n).
  - o *CLIA certification is required for laboratories performing tests within surgical centers or hospitals. K.A.R. 28-34-11(b); K.A.R. 28-34-59a(b)(1).*

- Airway and fluid management equipment and supplies must be available in the facility, as well as other supplies such as blood pressure cuffs. K.A.R. 28-34-135(c), (e).
  - *Specific medical equipment and supplies must be available in surgical suites, including cardiac monitors, a defibrillator, thoracotomy, and tracheotomy sets. K.A.R. 28-34-17b(c)(2).*
  - *There are also many requirements in place for obstetrical and newborn services such as airway, oxygen, resuscitation, and IV equipment. K.A.R. 28-34-18a(c).*

- All facilities must comply with local codes and ordinances, provide documentation of a plan to dispose of biomedical waste and human tissue, and be within 30 miles of an accredited hospital. K.A.R. 28-34-127(c).
  - *Certain forms of medical waste must be disposed of with a person specifically licensed to receive waste. K.A.R. 28-35-223a(b).*

It is true, as the majority points out, that evidence below suggested many of these regulations impose heightened burdens on abortion providers when measured against the "ordinary" regulatory burden borne by other providers. The majority weighs this fact heavily in its strict scrutiny analysis. I take no issue with that, as the actual application of strict scrutiny is not my concern here. It is axiomatic that most of the laws governments enact will fail a strict scrutiny analysis. Schraub, *Unsuspecting*, 96 B.U. L. Rev. 361, 406 (2016) ("We know that strict scrutiny review will invalidate most laws."); Fallon, *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1274 (2007) ("Most challenged legislation will be upheld as long as it is even rationally related to a legitimate governmental interest . . . [but] strict scrutiny's demand for narrow tailoring or necessity is the most stringent made by any doctrinal test of constitutional validity."). Instead, the similarities of the

interlaced regulations—between those governing abortion access and those governing access to other medical procedures—illustrate only that, as alluded to above, *all of these regulations will henceforth be subject to strict scrutiny.*

Even without the striking similarities, the crucial point would remain. Recall the wish of Kansans for Constitutional Freedom "that abortion should be regulated like all other medical procedures." Kite, *Anti-Abortion Groups Make Dubious Claims as Kansas Amendment Vote Nears*, Kansas Reflector (July 19, 2022). Today's decision grants that wish, but perhaps not in the way many people expected.

For indeed, there can be no difference in law—according to the majority's own section 1 jurisprudence in *Hodes I*—between "abortion" as an elective medical procedure and "all other medical procedures." They are identical in that access to all medical procedures must be protected as a fundamental right of personal autonomy. Extracting a tooth? Chemotherapy? Getting a vasectomy? Plastic surgery? Knee replacement? Getting contact lenses? Having an abortion? Chiropractic adjustment? All equally protected by section 1. And yes, the reader will have guessed by now—all these services are highly regulated in the state of Kansas (as is virtually every single other medical service one can think of). And every such "restrictive measure" has the effect of infringing on one's personal autonomy simply because it will make access to the service more expensive and less accessible than the service would otherwise be in an imagined libertarian utopia where no government regulations whatsoever impede the operation of the free market.

Consider further, as already suggested, that the majority's decision to protect against every slight infringement on personal autonomy cannot be limited—under the holding of *Hodes I*—to medical procedures. Certainly the choice to decide what substances enter one's own body must also directly implicate personal autonomy.

86

Common laws criminalizing drug use and possession immediately come to mind. K.S.A. 21-5709 criminalizes injecting, inhaling, or otherwise introducing a controlled substance into the human body. Every drug conviction in the state must now be subject to a strict scrutiny analysis.

And what about the massive regulatory edifice that is designed to protect our food supply? Surely eating is an activity protected by the fundamental right to personal autonomy! The majority will not shy from vigorously defending the rights of the people to access the food supply of their choice, will it? Because indeed, the state is—every single day—infringing on that right. Every line of regulatory code governing farms, ranches, meat-packing plants, farmer's markets, and back-yard chicken-egg stands makes food more expensive and less readily available. The whole stable of restaurant, meat, dairy, and other inspectors does the same. All now subject to strict scrutiny.

Or what about the right to cut and style one's hair? Surely personal autonomy includes a right to choose whether to have one's eyebrows threaded. But, here again, troublesome regulations stand in the way. See, e.g., K.A.R. 61-1-6 (prohibiting "use of shaving mugs and lather brushes" in barber shops); K.A.R. 61-1-1 (requiring all barber shops to be "open for inspection at any time during business hours to the members of the state board of barber examiners"); K.A.R. 69-6-3 (imposing limits on where a cosmetologist or manicurist license can be used). The list could (and does) go on. The Kansas Boards of Barbering and Cosmetology may not be long for this world. Surely the government does not have a compelling interest in who trims my beard?

In fact, dozens of other laws regulate a person's right to choose what happens to their body and must—according to the majority's own holding—be subjected to strict scrutiny. Just by way of example, Kansas regulates tattoos and piercings (K.S.A. 65-

1953); the use of car seat belts (K.S.A. 8-2503 [a][1]-[2]); the use of helmets while riding motorcycles and motorized bicycles (K.S.A. 8-1598); required student vaccinations (K.S.A. 76-761a[a]; K.S.A. 72-6262[a]); assisted suicide (K.S.A. 21-5407[a][2]); self-administration of medication (K.S.A. 72-6282); and public nudity (K.S.A. 21-5513). There are many more.

A massive swath of government action is now subject to the most rigorous and exacting standard of constitutionality—strict scrutiny. And no legal scholar or judge anywhere has ever even tried to suggest that all or even most of the plainly legitimate ends of government action could possibly survive such a test. None of this is to say that any of these listed regulations (and all others besides) *must* be constitutional. Rather, it illustrates so dramatically the damage the majority has done to the structure of our government by its section 1 jurisprudence. Let the lawsuits commence in this new target-rich environment. The majority has—perhaps unwittingly—put the entire administrative state on the chopping block of strict scrutiny.

*Who's Afraid of* Hodes I?

The holding of *Hodes I* compels these conclusions—to the majority's great chagrin. Responding to my claims, the majority launches an adjectival offensive accusing me of all kinds of calumny. Mine is a "cataclysmic premonition" that "strays . . . far afield" and results in a "hyperbolic panic." *Stanek*, 318 Kan. at ___, slip op. at 23. Clearly, a nerve is struck. What is going on in this back and forth between majority and dissent?

Simply put, when confronted directly in this dissent with the dramatic and almost incomprehensible ramifications of the *Hodes I* rule, the majority loses its nerve.

By sleight of judicial hand, the majority radically changes its holding. It abandons its firm commitment to the "fundamental right of personal autonomy" as soon as the context is shifted away from abortion. Instead, it suggests that some rights of personal autonomy are in fact not fundamental at all. To understand the mystery of this immensely consequential about-face, an in-depth review of our *Hodes I* decision is required.

In its introduction, the *Hodes I* majority states that "through the language in section 1, the state's founders acknowledged that the people had rights that preexisted the formation of the Kansas government." *Hodes I*, 309 Kan. at 614. Then, the majority summarizes that included in those preexisting natural rights is "the right of personal autonomy, which *includes* . . . whether to continue a pregnancy." (Emphasis added.) 309 Kan. at 614. Finally, the *Hodes I* court declares, "[T]his right is fundamental." 309 Kan. at 614. The phrase "this right" references—without a doubt—the "right of personal autonomy." A fact driven home by the majority's decision to enshrine in the syllabus of the case the holding that "[t]he natural right of personal autonomy is fundamental and thus requires applying strict scrutiny." 309 Kan. 610, Syl. ¶ 15.

To gain a detailed understanding of this holding, we must begin by recalling that in *Hodes I*, the district court had imported the federal jurisprudence of a substantive due process "right to privacy" into the Kansas Constitution and had held that "sections 1 and 2 of the Kansas Constitution Bill of Rights, like the Fourteenth Amendment, protect a fundamental right to abortion." 309 Kan. at 620. The *Hodes I* court *reversed* the district court on this point, holding it was an error of law. 309 Kan. at 623-24. Instead, *Hodes I* held that "section 1 of the Kansas Constitution Bill of Rights acknowledges rights that are distinct from and broader than the United States Constitution." 309 Kan. at 624. And that among these broader natural rights "is the right of personal autonomy." 309 Kan. at 624. So the *Hodes I* majority explicitly rejected the idea that the case was limited to deciding

89

whether section 1 protects a right to an abortion, opting instead for the notion that section 1's protections are "broader" and include a "fundamental right" of "personal autonomy" which—the court would later conclude—merely "includes" the right to terminate a pregnancy.

To fully understand both the reason behind the analytical path taken by the *Hodes I* court and its implications, it is important to track the reasoning of that decision closely. First, the court looked to the language of section 1 to observe that this "provision lists certain rights—life, liberty, and the pursuit of happiness—but indicates these are just among the natural rights Kansans possess." 309 Kan. at 625. "The framers made clear the list was not intended to be exhaustive—rather, the listed rights are 'among' the inalienable natural rights recognized by the provision." 309 Kan. at 626. The *Hodes I* majority observed that section 1 contains no parallel to the Fourteenth Amendment's "due process" clause and that as such, "section 1's focus on substantive rights removes from our calculus one of the criticisms of *Roe* and other decisions of the United States Supreme Court relying on substantive due process rights under the Fourteenth Amendment." 309 Kan. at 627.

Here, a crucial insight into the *Hodes I* decision is found. Because the *Hodes I* majority reveals a keen desire to avoid the much-criticized judicial notions of "penumbras" that "emanate" from our federal due process guarantees and coalesce into substantive privacy rights. See *Roe v. Wade*, 410 U.S. 113, 129, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), *overruled by Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022). Instead, the majority hoped to firmly ground the substantive protections of section 1 in that provision's text and history. The majority was bound to do so by our precedent—amply discussed in the opinion—demanding a close adherence to the text of the Kansas Constitution. See *Hodes I*, 309

90

Kan. 610, Syl. ¶ 4 ("Kansas courts look to the words of the Kansas Constitution to interpret its meaning. When the words do not make the drafters' and people's intent clear, courts look to the historical record, remembering the polestar is the intention of the makers and adopters of the relevant provisions.").

By choosing a more disciplined interpretive method, the *Hodes I* court foreclosed the looser and more flexible path taken by federal courts to finding a fundamental right to abortion in vague substantive due process concepts such as a "right to privacy"—a path since overruled by *Dobbs*. This choice necessitated a far more in-depth examination of the text and history of section 1—and most critically required the location of a *broader* right protected by section 1 within which the majority could reach its desired outcome of protecting the "activity" of abortion.

To achieve this, the *Hodes I* majority spends the bulk of its decision analyzing the substantive rights the founders sought to protect—recognizing them as "Lockean natural rights guarantees" which were broadly understood and relied upon at the time of the founding. 309 Kan. at 626. Next, the majority needed to articulate what, precisely, those Lockean natural rights were understood to encompass. In this portion of the decision, abortion never shows up. And why would it? The historical record of people articulating a natural Lockean right to abortion is nonexistent. If abortion had ever been articulated as a natural Lockean right, we can be certain the majority would have zeroed in on this and limited its holding to abortion only. But that path was not available to the majority given its proper and more textually disciplined interpretive commitments. We must keep in mind, the *Hodes I* majority was focused intensely on describing and defining a "natural right" that was "broader" than the right to an abortion, noting repeatedly that "the drafters [of section 1] made no attempt to list all rights; they incorporated the broad concept of

91

natural rights . . . and they expressed a desire to protect those rights from government infringement." 309 Kan. at 629.

And in fact, the historical record is replete with references and paeans to the broad natural Lockean right to "be let alone"—a phrase the majority quotes several times with approval. This right to "be let alone" "describe[s] a wide range of judicially enforceable rights." 309 Kan. at 636. But even this doesn't achieve the necessary specificity for concrete judicial rulemaking, so the court then turned "to the specific questions of what a natural right entails and whether it *includes* a woman's right to decide whether to continue a pregnancy." (Emphasis added.) 309 Kan. at 638-39.

It is here that the *Hodes I* court arrives at the descriptor "personal autonomy." And it does so after careful consideration of many different historical articulations of the right at issue. For example, the court cites decisions as early as 1642 which hold that it is unlawful to require merchants to wear certain clothes because "'it was against the liberty of the subject, for every subject hath freedom to put his clothes to be dressed by whom he will.'" 309 Kan. at 640.

Citing William Blackstone, Edmund Burke, and James Madison, the majority builds an impressive case that it was widely understood in English common law that "a person has an inviolable interest in the 'safety and liberty' of one's person." 309 Kan. at 640-41. Quoting a decision of the United States Supreme Court in 1891, the *Hodes I* court observed that "'the possession and control of his own person'" is the most "'sacred'" and "'carefully guarded . . . right of every individual.'" 309 Kan. at 641. This "is a component of the 'inviolate personality' of human beings." 309 Kan. at 641-42. Other decisions of state courts were favorably cited to the effect that every person "'has a right

to determine what shall be done with his own body'" and "'everyone has a fundamental right to the sole control of his or her person.'" 309 Kan. at 642-43.

The *Hodes I* majority even noted that governments "cannot intrude on a person's control of his or her own body" even "when the State regulates health care." 309 Kan. at 642. Thus, "[a]t the heart of a natural rights philosophy is the principle that individuals should be free to make choices about how to conduct their own lives, or, in other words, to exercise personal autonomy." 309 Kan. at 645. And this "natural-law right to control one's own body and to exercise self-determination stands firmly on the shoulders of the Lockean philosophies embraced in section 1's natural rights, which include liberty and the pursuit of happiness." 309 Kan. at 643-44. This is a mere sampling of the exhaustive historical case the *Hodes I* majority marshals for finding a fundamental right to personal autonomy in section 1 of the Kansas Constitution Bill of Rights.

Critically, it is only *after* the *Hodes I* court conducts such a detailed and thorough examination of the text and history of section 1 that it turns to the question of abortion. And here, it cannot be overlooked or understated that the court begins by presuming that the entire analysis summarized above applied *first* to the fundamental right to personal autonomy enjoyed by *men*. We know this—beyond any shadow of a doubt—because before confronting the abortion question proper, the majority felt it necessary to announce the holding (in a section title no less) that "*Section 1 Guarantees Women, as well as Men, the Right of Personal Autonomy.*" 309 Kan. at 645. Only then, finally, does the court conclude that "[d]enying a pregnant woman the ability to determine whether to continue a pregnancy would severely limit her right of personal autonomy." 309 Kan. at 646. As such, the "natural right of personal autonomy" must "include" the ability to "make health care decisions." 309 Kan. at 649.

93

If all of this weren't enough to convince a reader (or my colleagues) of the actual holding of *Hodes I*, just pay attention to the stirring conclusion of the decision: "At issue here is the inalienable natural right of personal autonomy, which is the heart of human dignity. . . . [A]ny government infringement of the inalienable natural right of personal autonomy requires the State to establish a compelling state interest and to show that [the regulation] is narrowly tailored to promote it." 309 Kan. at 671.

*The Majority Effectively Overrules* Hodes I

Everything I've written here about *Hodes I* and its implications is undeniable—that decision is written in black and white, published in the Kansas Reports, and available to judges, lawyers, scholars, and the public for each to draw their own conclusions. *Hodes I* (and now *Hodes II*) make it plain that this court has interpreted section 1 as guaranteeing a fundamental right of personal autonomy: "Section 1 of the Kansas Constitution Bill of Rights protects a fundamental right to personal autonomy, which *includes* the right to decide whether to terminate a pregnancy." (Emphasis added.) *Hodes II*, 318 Kan. ___, Syl. ¶ 3; *Hodes I*, 309 Kan. 610, Syl. ¶ 8. This sentiment is driven home no less than 30 times between *Hodes I* and *II*. *Hodes I*, 309 Kan. 610, Syl. ¶ 8, Syl. ¶ 11, 613, 614, 623, 624, 638, 639, 640, 644, 645, 646, 650, 659, 660, 663, 671, 674, 679, 680; *Hodes II*, 318 Kan. ___, Syl. ¶ 4, slip op. at 4, 14, 24.

But here, rather than simply applying the holding of *Hodes I* in a neutral and objective way—letting the chips fall where they may—the majority instead has written something entirely new, relieving itself of the obligation to reach its conclusion through a careful analysis of the text and history of section 1 by pretending that the analysis was completed previously. Indeed, the majority is at such pains to avoid the logical conclusions drawn by this dissent it has fled headlong from the legal framework

94

announced in *Hodes I* (all while claiming to follow that decision) and has written a pretzel-twist opinion that will fool no one.

One fact from today's decisions stands out above all others. The majority in *Hodes I* and *Hodes II* held that the "fundamental right" protected by section 1 is "personal autonomy" defined as "control over one's own body" and over one's "inviolate personality." *Hodes I*, 309 Kan. at 641-42, 644; *Hodes II*, 318 Kan. at ___, slip op. at 3. While the *same* majority that decided *Hodes II* has, on the very same day, held that *only* a significantly smaller subset of rights associated with personal autonomy—those the majority determines have "profound and unique attributes"—are fundamental and protected by section 1. *Stanek*, 318 Kan. at ___, slip op. at 15.

To demonstrate this remarkable contradiction, consider today's holding: "Section 1 of the Kansas Constitution Bill of rights protects an inalienable natural right of personal autonomy . . . . The unique and profound attributes of the decision to have an abortion are integral to a woman's inalienable natural right of personal autonomy . . . thus, laws that infringe on the right to abortion are subject to strict scrutiny." 318 Kan. ___, Syl. ¶ 4. Whatever this is, it is *not* a restatement of the *Hodes I* holding. Entirely absent is the "fundamental rights" bridge from a "natural right" to the application of "strict scrutiny"— replaced with a new, never-before seen "test" by which only rights determined to have "unique and profound attributes" are deemed "fundamental" and subject to strict scrutiny.

To bolster its newfound rule, the majority claims that *Hodes I* held: "As an inalienable natural right of personal autonomy with profound and unique attributes, the right to decide to have an abortion is a fundamental right subject to strict scrutiny." 318 Kan. at ___, slip op. at 15. This is simply false. As just meticulously explained above, *Hodes I* held that the right of *personal autonomy* is fundamental, and this right *includes*

the choice to terminate a pregnancy. Nowhere in *Hodes I* did this court undertake to decide whether the choice to abort had "profound and unique attributes." Those words never appear in *Hodes I*. Likewise, entirely absent from *Hodes I* is the idea that only *after* a right sounding in personal autonomy is found to have "profound and unique attributes" is it to be declared "fundamental" and "subject to strict scrutiny." Of particular note, the majority has *never* undertaken an analysis of abortion to determine what its "attributes" might be.

This is because the *Hodes I* decision works in exactly the opposite way. It starts by defining the "broader" natural right of "personal autonomy" which is "fundamental" and only then does it proceed to analyze abortion as an "activity" that may or may not be "included" in that right. And when it determines abortion is such an activity, it does so by weighing its impact on a person's ability to "control" their own "body"—not based on any mystical attributes such an activity may or may not possess.

The majority responds to my qualms with yet another falsehood, declaring that "this court's analysis in *Hodes I* examined the inalienable natural right to personal autonomy in the specific context of abortion, *which necessarily limited the scope of its holding*." 318 Kan. at ___, slip op. at 24-25. This is alternative universe thinking. It is so obviously untrue I am shocked the majority includes it. As I describe above, the bulk of *Hodes I* was about a *man's* fundamental right to personal autonomy in the Lockean natural rights discourse that was written into section 1. So much so that before transitioning to a discussion of abortion, the majority was forced to make a holding that women too have a fundamental right to personal autonomy. In other words, the majority located a fundamental right to personal autonomy in section 1 *before* it concluded that this right extended to women. The "context" of the analysis concerning the fundamental

right to personal autonomy in section 1 actually *excludes* abortion—rather than being limited by it.

Nonetheless, the majority plows ahead in its effort to "limit" the holding of *Hodes I* to abortion only. In so doing, it devises a brand-new legal test, invented out of thin air, with no analytical ties to either the text or history of section 1—though its convenience to the majority's cause is undeniable. The "profound and unique attributes" test is so vague, amorphous, and subjective as to eviscerate the clear holding of *Hodes I* and the allegedly cherished fundamental right to personal autonomy right along with it. Now, claims the majority, "each asserted right must be carefully examined and evaluated independently in the context of its own unique implications on an inalienable natural right found under section 1." 318 Kan. at ___, slip op. at 25. And the majority accuses me of failing to perform such an analysis and instead merely drawing a "false equivalence" between other activities sounding in personal autonomy—getting a vasectomy for example—and the "intimate, personal, and profound act of deciding to have an abortion." 318 Kan. at ___, slip op. at 24. Finally, the majority explicitly declares that the "limited scope of the *Hodes I* holding" is a woman's "decision[] regarding whether to have an abortion." 318 Kan. at ___, slip op. at 26. In all this, the majority is knowingly mis-representing the holding of *Hodes I*. And by so doing, the majority is effectively overruling that decision.

When confronted by all of this, the majority accuses me of "stray[ing] far afield" into "specious" territory. 318 Kan. at ___, slip op. at 23, 25. But why is it "specious" to hew closely and carefully to the actual holding of *Hodes I*? I suspect the answer is obvious—because the majority cringes at the full implications of *Hodes I* and cannot stomach living in the world wrought by that decision.

97

So instead, the majority faults my examples, calling them only "marginally . . . related" to personal autonomy. 318 Kan. at ___, slip op. at 23. Is the food I eat and the medical care I get *truly* only marginally related to the section 1 right? The majority proves too much. If "personal autonomy" includes access to so-called "abortion care," why wouldn't it likewise include other forms of medical care? A perfectly logical conclusion—one drawn explicitly by the *Hodes I* majority! Recall, the fundamental right as defined by *Hodes I* "includes the right to control one's own body, to assert bodily integrity, and to exercise self-determination." *Hodes I*, 309 Kan. at 680. This fundamental right clearly incorporates far more than the decision to obtain an abortion. I am not twisting the majority's language from *Hodes I*, nor am I putting words in its mouth. I am not splicing and dicing its opinion to suggest it said something it did not in fact state explicitly. No inferential leaps are necessary. The majority cannot possibly deny in good faith that *Hodes I* plainly and simply stated over and over that "the natural right of personal autonomy is fundamental and thus requires applying strict scrutiny." *Hodes I*, 309 Kan. at 663.

Remember too that the *Hodes I* decision indicated that even something as far removed from abortion as choosing what clothes to wear would be protected by the fundamental right to personal autonomy. Why wouldn't it include access to currently forbidden food supplies? Why wouldn't it include the decision to ingest perfectly natural chemical compounds? The majority cannot and will not confront these questions because there simply is no plausible way to legally distinguish them from "abortion care" and remain faithful to the holding of *Hodes I*. To pretend otherwise is to play the proverbial ostrich in the desert sands of our current section 1 jurisprudence.

Making matters much worse, the majority is not content to simply feign ignorance. In its desire to sidestep the inconvenient and damning conclusions set forth here, the

majority has been forced to deceive the public about its own core holdings—to the ruin of any coherence in this vastly important area of the law. That the majority thinks it can get away with such double-speak reveals just how far we have strayed from the rule of law. Its response to this dissent amounts to "don't believe your lying eyes." See Orwell, 1984, p. 103 ("The Party told you to reject the evidence of your eyes and ears. It was their final, most essential command."). Here the majority partakes of a kind of revisionist history courts should never participate in, as it fosters the clear impression that judges are hiding the ball from the people they ought to be serving in order to manufacture desired results.

Consider Justice Rosen's separate concurring opinion. There, Justice Rosen simply admits the majority has carelessly tossed about legal concepts, terms of art, and well-defined doctrines in a mish-mash opinion that essentially says—it doesn't matter what our rationale is because *labels don't matter*. *Stanek*, 318 Kan. at ___, slip op. at 53 (Rosen, J., concurring) ("Whether one describes a right as a natural one protected by section 1 or a fundamental one protected by section 1, the right receives rigorous protection under our Bill of Rights. No matter the label we give it, infringements of that right are subject to strict scrutiny.").

But contrary to Justice Rosen's claim, "natural rights" and "fundamental rights" are not fungible categories. Each distinct legal concept functions in a separate way to achieve different outcomes in any carefully reasoned legal analysis. Sometimes they can work together, in a two-step process, but not always. To illustrate, we need look no further than the decision in *Hodes I*. There, this court plainly and repeatedly acknowledged the legal distinction between natural and fundamental rights. Indeed, the entire structure of the *Hodes I* opinion illustrates that the concepts of natural and fundamental rights are unique.

"We conclude that, through the language in section 1, the state's founders acknowledged that the people had rights that preexisted the formation of the Kansas government. There they listed several of these natural, inalienable rights . . . .

"Included in that limited category is the right of personal autonomy, which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows a woman to make her own decisions regarding her body, health, family formation, and family life—decisions that can include whether to continue a pregnancy. Although not absolute, this right is fundamental." *Hodes I*, 309 Kan. at 614.

*Hodes I* made clear many times over that it was the classification of the right as fundamental—not natural—which required the use of strict scrutiny. See 309 Kan. at 663 ("As we have already noted, the natural right of personal autonomy is fundamental and thus requires applying strict scrutiny."). Elsewhere in the majority's section 1 jurisprudence, the analysis has not required moving beyond the first, "natural rights" stage. In *State v. Carr*, 314 Kan. 615, 629, 502 P.3d 546 (2022), *cert. denied* 143 S. Ct. 58 (2023), this court evaluated the right to life under section 1. The court readily concluded that section 1 protected the "natural right" to life but did not proceed to undertake an analysis of whether this natural right was also "fundamental" because the court held that natural rights may be forfeit. See *Carr*, 314 Kan. at 644; but see *Carr*, 314 Kan. at 733 (Stegall, J., concurring) ("[T]he essential effect of the *Hodes* decision is revealed to be what I explained it to be at the time—that 'it fundamentally alters the structure of our government to magnify the power of the state.' That shift—the magnification of state power—is enacted today as we hold that a citizen's limited section 1 rights are 'forfeited when a person's criminal conduct necessitates punishment.' Thus, the majority makes it explicit that a criminal defendant has no section 1 protections at all. Indeed, according to the majority, 'the state's power to punish' is limited only by 'due

process' and 'cruel or unusual' provisions which 'do not arise under section 1.' [Citations omitted.]"). Does the majority believe fundamental rights may also be forfeit, because it doesn't matter what "label we give it"? *Stanek*, 318 Kan. at ___, slip op. at 53 (Rosen, J., concurring). Have incarcerated women forfeited the right to abortion?

Contrary to Justice Rosen, federal courts—which pioneered the whole concept of "fundamental rights" animating substantive due process—label a right "fundamental" only to justify the application of a strict scrutiny standard of review. See *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) ("We must therefore 'exercise the utmost care whenever we are asked to break new ground in this field,' lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court. [Citations omitted.]"). The test for fundamental rights is commonly articulated as whether the right is "'deeply rooted in [our] history and tradition' and whether it is essential to our Nation's 'scheme of ordered liberty.'" *Dobbs*, 597 U.S. at 237-38.

I know Justice Rosen understands this because very recently, in a different case, he wrote:

> "To decide whether targeted legislation has crossed the line triggering a higher level of scrutiny, a court decides whether it implicates a fundamental right or liberty that is '"deeply rooted in this Nation's history and tradition" . . . and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed."' *Glucksberg*, 521 U.S. at 721 (quoting *Moore v. City of E. Cleveland*, *Ohio*, 431 U.S. 494, 503, 97 S. Ct. 1932, 52 L. Ed. 2d 531 [1977]; *Palko v. Connecticut*, 302 U.S. 319, 325, 326, 58 S. Ct. 149, 152, 82 L. Ed. 288 [1937])." *State v. Genson*, 316 Kan. 130, 147, 513 P.3d 1192 (2022) (Rosen, J., dissenting).

But here, Justice Rosen rejects the hallmarks of judicial decision making—careful, studied, precise, and analytical reasoning—with a labels-don't-matter shrug. In so doing, Justice Rosen (like his colleagues in the majority) likewise rejects the *Hodes I* holding that personal autonomy is a fundamental right and retreats to urging district courts to consider whether the "interest at stake . . . has profound and unique attributes." *Stanek*, 318 Kan. at ___, slip op. at 53 (Rosen, J., concurring). District court judges will, he trusts, figure it out.

The majority doubles down on Justice Rosen's shrug, claiming that *Hodes I* simply "equated" the holding that personal autonomy is a "natural inalienable right" with the conclusion that personal autonomy is a "fundamental right." See *Stanek*, 318 Kan. at ___, slip op. at 17. This is a decidedly odd way for a court to reason. If it were true, the term "fundamental right" as used in *Hodes I* is entirely superfluous—it does no work whatsoever.

Given this, what, exactly, will district courts be figuring out? The majority's new "profound and unique attributes" test could actually result in the exclusion of some cherished rights from the category of "fundamental" rights. Consider speech. The right to free speech is certainly deeply rooted in our history and tradition and essential to our scheme of ordered liberty. See *Thornhill v. State of Alabama*, 310 U.S. 88, 95, 60 S. Ct. 736, 84 L. Ed. 1093 (1940); *U.S.D. No. 503 v. McKinney*, 236 Kan. 224, 234, 689 P.2d 860 (1984) (recognizing freedom of speech as "among the most fundamental personal rights and liberties of the people"). But does it have "profound and unique attributes?" Speech is almost always pedestrian and certainly always ubiquitous. Does this mean the right to speech is not fundamental? Not natural?

What about the right to contract previously identified as a natural right in *Hodes I*? *Hodes I*, 309 Kan. at 634. Is this right "unique and profound" or is it also pedestrian and ubiquitous? Perhaps this "natural inalienable right" simply "equates" to a fundamental right subject to strict scrutiny? Has the majority unwittingly subjected all economic regulation to its strict scrutiny regime? Who knows. In a context in which labels and concrete judicial doctrines don't matter, "figuring it out" will amount to nothing more than subjective policy making which will sway with the gravitational pull of each judge's personal preference. Such is the rule we firmly establish today.

Once again, the reader is confronted with the perplexing question—what is going on here? In short, Kansas constitutional law has been rendered a failed state by this court's zeal to preserve a regime of unrestricted access to abortion. And as the managers of this failed state, the justices in the majority are left with no choice but to debase the currency. Today's decision is the equivalent of printing money, adding zeros to old bank notes because labels don't matter. The rest of us—lower court judges, lawyers, litigants, and Kansans—will be left to cart wheelbarrows full of now meaningless legal words, concepts, and jargon into courts hoping against hope that it will be enough to win the arbitrary favor of whoever happens to be presiding.

The majority has, in essence, treated the law as one giant game of "chicken"— daring judges, lawyers, litigants, and the public we serve to ignore the incoherence in its rulings or else face a baldly announced plan to drive all of section 1 into the ditch labeled "abortion care." I simply cannot accept—and I do not think the Kansas judiciary will accept—this bargain. I choose instead to take *Hodes I* at its word, as all judges must, and conclude that when the Kansas Supreme Court declares that the Kansas Constitution protects a fundamental right of personal autonomy, it means what it says.

Thus, notwithstanding the majority's palpable nervousness at seeing the consequences of its constitutional edicts laid bare, I must proceed as if, in fact, the right to personal autonomy is fundamental. And all the nonsensical talk about first deciding whether an "activity" has "attributes" that are "profound and unique" and only then deciding that such an activity is "fundamental" to the right of personal autonomy is just that—nonsense.

*A Case Study in Hair*

To illustrate what this looks like, consider a case study. I earlier wondered whether the state could have a compelling interest in who trimmed my beard. This proved too much for the majority's sensibilities. It feigned offense on behalf of pregnant women everywhere, writing "[t]he dissent trivializes and attempts to minimize the fundamental nature of a woman's decision to continue or terminate a pregnancy by comparing it to a man's decision to grow or trim a beard." *Stanek*, 318 Kan. at ___, slip op. at 25. It accused me of making a "facetious comparison" that is "both inappropriate and denigrating to women faced with decisions between childbirth and abortion." 318 Kan. at ___, slip op. at 25. Of course a cursory review of what I wrote makes it clear this is false. Nowhere did I "compare" the *experience* of having an abortion with getting a haircut. This kind of juvenile moralizing would be ignored but for the light it sheds on the legal questions at issue.

For by "misunderstanding" my point, the majority illustrates its inability to grasp the scope of the framework declared in *Hodes I*. Though I have never sanctioned that framework, I cannot ignore the majority's dismissal of personal autonomy rights it haphazardly brushes off as trivial. The majority's stab at painting me as a bad person inadvertently reveals a damning ignorance about the precise area of law it is attempting to

104

rule on. Is the majority not aware that hair growth, hair removal, and hair styling is one of the most hotly contested, litigated, and legislated upon topics under the umbrella of "personal autonomy"? Apparently, it is not.

It is inexcusable that four justices on this court purporting to make the most consequential decisions about our fundamental law will cover their complete lack of inquiry into the consequences of their decisions with petty and transparently false insults. Since the majority is so incurious, I will spell it out. It turns out that body hair is one of the most personal and intimate expressions of the "inviolate personality" of human beings, often inseparable from religious and racial identities, and always a baseline indicator of a person's expression of individual identity.

Wendy Greene, one of the nation's foremost legal experts on hair discrimination and a legal architect of the federal CROWN Act—an acronym for "Create a Respectful and Open World for Natural Hair"—has declared that how one chooses to style their hair "is a defining feature of their identity and personhood." Greene, *A Multidimensional Analysis of What Not to Wear in the Workplace: Hijabs and Natural Hair*, 8 FIU L. Rev. 333, 359 (2013). Others have similarly asserted that imposing regulations on one's choice of hair style restricts "bodily autonomy" and erases black culture. Boyd, *Hair Me Out: Why Discrimination Against Black Hair Is Race Discrimination Under Title VII*, 31 Am. Univ. J. of Gender, Social Policy & the Law 75, 103 (2023). Indeed, the decision of how to adorn one's head "is highly personal," and each person may hold different reasons for their choice; some reflect a religious conviction, others choose protective styles to maintain hair health, some embrace certain styles to express a political position, a national or family heritage, or as part of a cultural identity; some have "simply a personal interest in projecting a special image or character," "and/or . . . a myriad of other personal, financial, medical, religious, or spiritual reasons." NYC Commission on Human

Rights:  Legal Enforcement Guidance on Race Discrimination on the Basis of Hair, pp. 3-4 (Feb. 2019); *Miller v. School District No. 167, Cook County, Illinois*, 495 F.2d 658, 663 (7th Cir. 1974); see also *Karr v. Schmidt*, 460 F.2d 609, 621 (5th Cir. 1972) (Wisdom, J., dissenting) ("Hair is a purely personal matter—a matter of personal style which for centuries has been one aspect of the manner in which we hold ourselves out to the rest of the world. . . . [H]air is a symbol:  of elegance, of efficiency, of affinity and association, of non-conformity and rejection of traditional values.").

In politics too, hair is a potent symbol and expression of political ideals, goals, and persona. In 2015, Representative Katherine Clark—now the high-ranking democratic whip—decided to "go grey"—that is, to stop dying her hair. She faced immediate pushback and implicit claims that her "small bottle of brown hair dye" was the source of her "competence and effectiveness." She rejected this notion entirely and went so far as to explicitly "compare" her choice of hair-style to women's reproductive rights, saying that the "same systems" that lead to government regulation of abortion also "tell us how to wear our hair." Clark, *The Politics of Going Gray*, WBUR (Jan. 13, 2022). Perhaps the majority thinks Representative Clark is also "denigrating . . . women faced with decisions between childbirth and abortion"? *Stanek*, 318 Kan. at ___, slip op. at 25. In a similar vein, but from a very different corner of the political landscape, the Wall Street Journal recently reported that Javier Milei—Argentina's populist president—"rocks a mop" that "reflects his nonconformist campaign." Gallagher, *This Politician Just Won Argentina's Primary. His Hair Is Baffling the World*, Wall Street Journal (Aug. 16, 2023).

Regardless of the reasons one may choose a certain hair style, the point is that each person's "right [of] personal appearance is inextricably bound up with the historically recognized right of 'every individual to the possession and control of his own person,' and, perhaps even more fundamentally, with 'the right to be let alone.'" *Kelley v.*

106

*Johnson*, 425 U.S. 238, 250-53, 96 S. Ct. 1440, 47 L. Ed. 2d 708 (1976) (Marshall, J., dissenting). Is Thurgood Marshall a bad man for thinking that one's personal appearance may be intimately connected to their personal autonomy?

The literature and caselaw is replete with the idea that regulation of hair "divests" individuals of "complete autonomy over deeply personal, political, as well as pragmatic grooming choices." Greene, 8 FIU L. Rev. at 350; see also *Olff v. E. Side Union High School District*, 404 U.S. 1042, 1043-44, 92 S. Ct. 703, 30 L. Ed. 2d 736 (1972) (Douglas, J., dissenting) ("Hair style is highly personal," a "purely private choice," and should be "left to family or individual control and [be] of no legitimate concern to the State"; "[o]ne's hair style, like one's taste for food, or one's liking for certain kinds of music, art, reading, recreation, is certainly fundamental in our constitutional scheme—a scheme designed to keep government off the backs of people"); *Domico v. Rapides Par. School Board*, 675 F.2d 100, 101-02 (5th Cir. 1982) (noting cases that have invalidated regulations that "prescrib[e] the choice of coiffure or beard," because citizens "unqualifiedly" have the right "to choose their mode of personal hair grooming within the great host of liberties protected by the Fourteenth Amendment from arbitrary state action."); Pergament, *It's Not Just Hair: Historical and Cultural Considerations for an Emerging Technology*, 75 Chi.-Kent L. Rev. 41, 43-44, 48 (1999) ("Although hair is a physiological phenomenon, it is also a social one. Hair is an object of intense elaboration and preoccupation in almost all societies. Hairstyles and rituals surrounding hair care and adornment convey powerful messages about a person's beliefs, lifestyles, and commitments. Inferences and judgments about a person's morality, sexual orientation, political persuasion, religious sentiments and, in some cultures, socio-economic status can sometimes be surmised by seeing a particular hairstyle. . . . Totalitarian governments have used hair as a means of social control. In Nazi Germany, for example, forced 'hair taking' played an intrinsic role in the government's attempts at social control and

domination of Jews."); *E. Hartford Ed. Association v. Board of Ed. of Town of E. Hartford*, 405 F. Supp. 94, 98-99 (D. Conn. 1975) (restrictions on hair—such as requiring "remov[al] [of] a beard" or changing one's hair style—present a "significant invasion of personal choice and individual liberty"), *aff'd* 562 F.2d 838 (2d Cir. 1977).

Academic research aside, cultures across time and space have assigned value and meaning to hairstyles. Consider the literary examples focusing on hair—from Medusa, to the Gift of the Magi, to Rapunzel. Examples abound. "Sampson's locks symbolically signified his virility. Many of the Founding Fathers of this country wore wigs. President Lincoln grew a beard at the suggestion of a juvenile female admirer. Chief Justice Hughes' beard furnished the model for the frieze over the portico of the Supreme Court of the United States proclaiming 'equal justice under law.'" *Olff*, 404 U.S. at 1044 n.2 (Douglas, J., dissenting).

The majority seems to believe that how one chooses to style their hair is inconsequential and not as "fundamental" as the choice to obtain an abortion. As I have just demonstrated, this is patently untrue, as hair is widely regarded to be an intimate expression of inviolate personality and can have substantial societal and cultural significance. But even if we were to suppose that one's hairstyle is indeed a trivial and inconsequential choice, the right to "personal autonomy" afforded to Kansans would certainly be an "incomplete protection if it encompasses only the right to do momentous acts, leaving the state free to interfere with those personal aspects of our lives which have no direct bearing on the ability of others to enjoy their liberty." *Richards v. Thurston*, 424 F.2d 1281, 1284-85 (1st Cir. 1970) ("[W]ithin the commodious concept of liberty, embracing freedoms great and small, is the right to wear one's hair as he wishes.").

At this point, readers may wonder why I have spent pages discussing government regulation of hair growth, hair removal, and hair styling. It is because in this example—so familiar to every human being—that we find the raw essence of the majority's utter failure distilled to Marx's memorable phrase—the majority's section 1 jurisprudence manifests itself first as tragedy, and second as farce. Marx, *The Eighteenth Brumaire of Louis Bonaparte*, in Karl Marx: Selected Writings, p. 188 (Simon, ed., 1994).

Here we see with a clarity that is rare in the law what the majority stubbornly refuses to reckon with—the thing about *autonomy* is that it is *personal*. And there is no principle available in law to limn its boundaries. In that vacuum, the majority substitutes finger-wagging and manufactured outrage about how morally obtuse and insensitive it is to "compare" some people's expression of personal autonomy to others'. But this is a woefully inadequate foundation upon which to build a legal regime. Who are we to say that hair is not a deep and intimately personal expression of "the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life"? *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 851, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992), *overruled by Dobbs*, 597 U.S. 215; see also *Lawrence v. Texas*, 539 U.S. 558, 574, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003). Who are we to decide by fiat that one person's control of their own body is profound and protected while another's is silly and unprotected?

Unless and until, of course, the majority concedes that what it is actually doing is not constitutional law at all—but policy-making. Because this is precisely what the majority is doing, and in the process it is usurping the power of policy-making delegated by the people to their representatives in the political branches of government. To be crystal clear: *Hodes I* and *II* demand that once a law is found to impact a right sounding in personal autonomy, it is subject to strict scrutiny. Consequently, all regulations

109

impacting those choices are subject to strict scrutiny under *Hodes I* and *II*. Thus, no matter how badly it offends the majority, under *Hodes I* and *II*, who trims my beard is *in fact* none of the government's business. By suggesting otherwise, the majority's reasoning is revealed in a flash—as was Hans Christian Anderson's fairy-tale emperor—to be an embarrassingly naked exercise in policy-making.

As fate has written things, this year's legislative session in Kansas provides an example of such policy-making in its purest form, concerning the politically charged subject of—yes—hair removal. Scant weeks ago, the Kansas Legislature passed a bill deregulating certain methods of hair removal, only to have it vetoed by Governor Laura Kelly. S.B. 434 (2024). In her veto message, Governor Kelly explained that deregulation "could lead to safety and sanitation problems. We have a responsibility to protect Kansans—and this deregulation would threaten the health and safety of Kansans." *Governor Kelly Vetoes Bills, Allows One to Become Law Without Signature*, Kansas Office of the Governor (April 12, 2024). So, the fundamental right to personal autonomy—to have control over one's body—guarantees a woman's right to have an unborn child removed from her womb without government regulation, while hair removal "threaten[s] the long-term health and safety of Kansans" and must be regulated by the "expertise" of the Kansas Board of Cosmetology? *Governor Kelly Vetoes Bills, Allows One to Become Law Without Signature*, Kansas Office of the Governor (April 12, 2024). As a matter of policy, these choices may be defensible. As a matter of constitutional law, it is incoherent.

*The Aftermath*

"The Court's authority—possessed of neither the purse nor the sword—ultimately rests on sustained public confidence in its moral sanction." *Baker v. Carr*, 369 U.S. 186,

110

267, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962) (Frankfurter, J., dissenting); see also *Casey*, 505 U.S. at 865 (without power from the purse or the sword, the authority of the judiciary instead lies "in its legitimacy, a product of substance and perception that shows itself in the people's acceptance of the Judiciary as fit to determine what the . . . law means and to declare what it demands"); The Federalist No. 78, at 465-66 (Hamilton) (Rossiter ed., 1961); Elliot, *Public Trust Is a Fragile Bond*, 77 Conn. B.J. 41, 42, 43 (2003) ("The fundamental source of judicial power and authority in the United States inevitably is the common consent of the American people that this country is best served by accepting a decision by a court as ending the dispute in which it is rendered. . . . That bond of trust between the people and their judiciary is the sealing wax of the rule of law, and it is all on which the judiciary can rely for the effectiveness of its ministry of justice.").

Today, we have squandered a goodly chunk of that authority. By pretending to *follow* the law while instead *rewriting* the law, the majority eschews the core competency of constitutional judging—reason, neutrality, and a dedication to truth. It has rejected the obligation to put forth a "sincere effort[] to reason in terms of precepts that transcend the individual case and that are conscientiously seen as governing in all cases within their stated terms." Mishkin, *The Uses of Ambivalence:  Reflections on the Supreme Court and the Constitutionality of Affirmative Action*, 131 U. Pa. L. Rev. 907, 909, 929, 930 (1983). Instead, it has engaged in decision-making that simply "sugarcoat[s] an otherwise unpalatable decision," or worse—"obfuscat[es] the real meaning or effect of the decision"—thus "strip[ping] the judicial reasoning of its justificatory power within legal discourse and debas[ing] its stature as controlling authority in future cases." Reichman, *The Dimensions of Law:  Judicial Craft, Its Public Perception, and the Role of the Scholar*, 95 Calif. L. Rev. 1619, 1622 n.12 (2007); see also *Rita v. United States*, 551 U.S. 338, 356, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007) ("Confidence in a judge's use of reason underlies the public's trust in the judicial institution.").

The public "accept[s] the finality of a court decision because, and only because, it trusts that the results have been reached with impartiality, without prejudice, and in good faith," and this trust "reposed in the judiciary is a fragile thing." Elliot, 77 Conn. B.J. at 43. By "sacrificing reasoning for result," this court has "undercut its overall standing as a principled institution," and once Kansans realize we are "acting as an institution which caters to result-oriented popular demands," we will cease to "enjoy the confidence the public entrusts with [us] as a court of law." Reichman, 95 Cal. L. Rev. at 1629, 1667, n.210.

In short, "[m]aintaining public trust in the judiciary as an institution driven by legal principles rather than political concerns is a structural imperative. The rule of law depends upon it." *Wolfson v. Concannon*, 811 F.3d 1176, 1187-88 (9th Cir. 2016) (Berzon, J., concurring). Unfortunately for Kansans, today our state's high court has undermined its place as a respected institution grounded on legal principles, and risks losing whatever perceived legitimacy we once had. Because of today's decision, no Kansan "can be sure that he may not be tomorrow the victim of a spirit of injustice, by which he may be a gainer today." The Federalist No. 78, at 470. The "foundations of public and private confidence" have been "sap[ped]," and "in its stead universal distrust and distress" will be sure to flower. The Federalist No. 78, at 470.

*Conclusion*

The majority has accused me of playing Chicken Little to "cataclysmic" effect. *Stanek*, 318 Kan. at ___, slip op. at 23. Perhaps the majority ought to contemplate the fact that it was *Hodes I* that set this cataclysm in motion. A cataclysm that began by including a wide range of human behavior in the protections afforded by section 1, only to

112

immediately strip those protections away from everyone not a member of the majority's favored class—pregnant women seeking abortions—upon discovering that when exercised by most people most of the time, personal autonomy is simply not "profound" enough to satisfy the majority's moral sense of worthiness. That this remains the only gauge by which such things might be judged is, perhaps, the worst cataclysm of all.

The questions posed by this dissent have been asked not because the future of the regulatory state hangs on their threads (though I suppose it might), but because they open the judicial accounting books and amply demonstrate that the *Hodes I* court's analysis is so far overdrawn as to have utterly bankrupted important judicial concepts and doctrines such as "fundamental rights." Just as pyramid-schemers move assets from place to place to stay one step ahead of creditors, legal auditors searching for fundamental rights in this court's jurisprudence are now confronted with a sophisticated shell game. Now you see them, now you don't.

I decline the majority's offered Hobson's choice—its invitation to perform an illusory analysis of which "activities" include "attributes" that are "profound and unique" and thus considered "fundamental" and "included" in the now watered-down right to personal autonomy. And when, in future cases, the majority chooses to turn a blind eye to government regulations it happens to favor—that is, to fail to extend the plain holdings of its abortion jurisprudence in *Hodes I* and *Hodes II*—we will know a game is afoot. It is a game Justice Sandra Day O'Connor recognized when she wrote that "no legal rule or doctrine is safe from ad hoc nullification by this Court when an occasion for its application arises in a case involving state regulation of abortion." *Thornburgh v. American Coll. of Obst. & Gyn.*, 476 U.S. 747, 814, 106 S. Ct. 2169, 90 L. Ed. 2d 779 (1986) (O'Connor, J., dissenting). Only this time, the game will be played in reverse.

Having set precedent in the arena of abortion policy, we have already begun to nullify it in anticipation of its dictates proving too absurd and unworkable to apply.

In other words, as predicted in *Hodes I*, a legal regime of unrestricted access to abortion has become "the judicially preferred policy tail wagging the structure of government dog" and, as such, every rule and even judicial coherence and consistency will "give way, at every turn, to the favored policy." 309 Kan. at 778 (Stegall, J., dissenting).

I dissent.